

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**ENTERED**
**07/11/2008**

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 05-95161-H4-7** |
| | § | |
| **HOUSTON DRYWALL, INC.** | § | **(CHAPTER 7)** |
| | § | |
| **Debtor** | § | |
| | § | |
| _____ | § | _____ |
| | § | |
| **WILLIAM WEST, CHAPTER 7** | § | |
| **TRUSTEE FOR CLASSIC** | § | |
| **CONTRACTORS OF HOUSTON, LTD.** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **ADVERSARY NO. 06-03415** |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| **MATT L. SEIFFERT, MICHELLE C.** | § | |
| **SEIFFERT, MELANIE K.** | § | |
| **DURANT, GENE MENDEL, LARRY** | § | |
| **T. MASON, MELINDA A. SEIFFERT,** | § | |
| **AND PARTNERS LAND** | § | |
| **DEVELOPMENT, L.P.** | § | |
| | § | |
| **Defendants** | § | |
| | § | |

**MEMORANDUM OPINION ON TRUSTEE'S AMENDED COMPLAINT**
[Docket No. 169]

## I.  Introduction

The plaintiff, William West (West or Trustee), is the Trustee for the Chapter 7 bankruptcy estate of Classic Contractors of Houston, Ltd. (Classic or the Debtor).  On February 6, 2007, Lowell Cage (Cage) and Janet Casciato-Northrup (Northrup)—the Chapter 7 trustees for the bankruptcy estates of Gary Mendel (Mendel) and Robert G. Marek (Marek), respectively—filed an involuntary petition against Classic.[1]  This Court entered an order for relief in Classic's case on March 15, 2007.

The defendants are legion.  Matt Seiffert (Seiffert) is a sophisticated businessman who has two prior criminal convictions for white-collar felonies.  For the past several years, he has been engaged in land development through Classic and defendant Partners Land Development LP (PLD).  Melanie Durant (Melanie), Seiffert's eldest daughter, assisted him in these business activities.   Michelle Seiffert (Michelle) and Melinda Seiffert (Melinda), Seiffert's other daughters, are not actively involved in these businesses, but their father has ensured that they each own partnership interests in both Classic and PLD.

A considerable source of revenue for land developers comes in the form of Tax Increment Reinvestment Zone (TIRZ) payments.   The TIRZ payments are made by a municipality—here, the city of Houston, Texas—to a developer as reimbursement for constructing roads, sewers, and other infrastructure.  Until the municipality actually makes the payments, the asset on the developer's books is a receivable (TIRZ receivable).  Classic was involved with land development in the City of Houston Tax Increment Reinvestment Zone #10 and, in exchange for its development activities in this area, became entitled to TIRZ receivables having a substantial value.   Thereafter, Classic, through the machinations of its principal,

---

[1] Both Mendel and Marek held limited partnership interests in Classic until these interests became part of their Chapter 7 bankruptcy estates subsequent to the filing of each of their voluntary Chapter 7 petitions.

Seiffert, surreptitiously transferred the TIRZ receivables to Seiffert, Melanie, Michelle, Melinda, PLD, and other parties who are no longer defendants in this suit.[2]

This adversary proceeding was originally filed on June 2, 2006 by Gulf Coast Bank & Trust Company (the Bank), one of the unsecured creditors of Houston Drywall, Inc. (HDI), an entity that filed a voluntary Chapter 7 petition on November 17, 2005.[3] On September 27, 2004, the Bank and HDI entered into a Receivables Purchase Agreement which granted the Bank a security interest in all accounts receivable and debts owed to HDI. During the existence of HDI and Classic, HDI made loans totaling approximately $1.3 million to Classic. Because (a) Classic owed HDI this debt, (b) HDI had defaulted under its obligations to the Bank, and (c) the Bank had a properly perfected lien on monies owed to HDI, the Bank brought suit against Classic and its various insiders for these monies, and for other transfers that Classic had made to various insiders, including Seiffert, Gene, and Mason.

At the time that the Bank brought this suit, Classic was not yet in bankruptcy; therefore, it made sense for the Bank to file the suit in HDI's Chapter 7 case. The Bank sought to recover monies that Classic had received and transferred to its insiders which deprived non-insider creditors of both HDI and Classic from receiving payment on their claims. However, once this Court entered an order for relief in Classic's case on March 15, 2007, and West became Classic's Trustee, it made sense for West to substitute in for the Bank as plaintiff and continue this adversary proceeding on behalf of all of the creditors of Classic, including: (a) the Bank (which, in addition to being a creditor in HDI's case, is also a creditor in Classic's case); (b) the Chapter

---

[2] Gene Mendel (Gene), who is related to Gary Mendel, and Larry T. Mason (Mason) received assignments from Classic of TIRZ receivables. Gene and Mason were originally named as defendants in this adversary proceeding. However, Gene and Mason settled with West prior to this trial, and are therefore no longer defendants.

[3] HDI was owned by Marek, Mendel, and Mason, who are the same individuals who, together with Seiffert, initially formed Classic.

7 Trustee in HDI's case (who has filed a proof of claim for $1.3 million in Classic's case); and

(c) Cage and Northrup (who are creditors of Classic because, as holders of limited partnership

interests in Classic, they were entitled to a distribution of the TIRZ receivables just as the other

limited partners received).

As the plaintiff, West now to recover the TIRZ receivables which have been transferred,

plus interest, as well as reasonable costs and attorney's fees, for Classic's Chapter 7 estate.  He

seeks such relief pursuant to 11 U.S.C. § 547, the Texas Uniform Fraudulent Transfer Act

(TUFTA), 11 U.S.C. § 548, and common law fiduciary duties.

## II.    Findings of Fact[4]

The facts, as stipulated to or admitted by the parties, or as adduced from testimony of

various witnesses, or as established by the introduction of exhibits, are as follows:

1. Robert G. Marek, Gary S. Mendel, and Larry T. Mason owned an entity known as
   Houston Drywall, Inc. (HDI).  [Seiffert Ex. No. 31].

2. Partners Land Development, LP (PLD) is owned by the following persons and entities in
   the following amounts and percentages: (i) Matt Seiffert, $585,000 (65%); (ii) Melanie
   Durant, $117,000 (13%); (iii) Melinda Seiffert, $63,000 (7%); (iv) Michelle Seiffert,
   $63,000 (7%); and (v) Partners Land Development, GP, $72,000 (8%).  [Trustee Ex. No.
   38–39].   Melanie is the manager, president, and sole member of Partners Land
   Development, GP.  [Joint Ex. No. 1].

3. On July 31, 2000, an Agreement of Limited Partnership of Classic Contractors of
   Houston, Ltd. (the Agreement) was executed, and as a result thereof, an entity known as
   Classic Contractors of Houston, Ltd. (Classic) was formed from its predecessor, Classic

---

[4] Even though the Introduction in this Memorandum Opinion defined certain names and terms, the Findings of Fact
will, for ease of reading, once again define these names and terms, as well as additional names and terms.

Contractors of Houston, Inc. [Seiffert Ex. No. 2]. The signatories to the Agreement were

Marek (then president), Seiffert, Mendel, and Mason. *Id.* Classic's business was

primarily in residential real estate development. [Docket No. 231, p. 2]. Accordingly, it

acquired real estate and helped to develop lots. [Docket No. 230, p. 3].

4. The Agreement expressly provides that on the transfer of a general or limited partner's

interest without the unanimous consent of the limited partners, the interest transferred is

limited to the transferor's allocations and distributions and the transferee shall have no

right or authority to: (i) participate in any decisions required or permitted by a partner, or

(ii) inspect the partnership's books, or (iii) exercise any rights or powers of a partner or to

otherwise be treated as a general or limited partner of Classic. [Seiffert Ex. No. 2].

5. Although Classic was originally formed by Seiffert, Marek, Mendel, and Mason,

eventually other individuals, including Seiffert's three daughters—Melanie, Melinda, and

Michelle—obtained limited partnership interests in this entity. Seiffert is a sophisticated

businessman, and each of the other limited partners were less sophisticated than Seiffert.

6. Seiffert was not only an officer of Classic, but also exerted control over Classic. [June 3,

2008 Tr. 4:27:46–4:28:49[5]]; [Seiffert Ex. No. 14, p. 3]. Additionally, as of February 1,

2006, Seiffert was president of Classic. [Trustee Ex. No. 10]. Seiffert has previous

felony convictions for bank fraud and tax fraud. [Trustee Ex. No. 47]. His daughters

were aware of his felony convictions.

7. The initial partnership interests in Classic were divided as follows: (i) Seiffert, 50%; (ii)

Marek, 15.666%; (iii) Mendel, 16.667%; (iv) Mason, 16.667%; and (v) Classic GP, LLC

(Classic GP), 1% as general partner. [Seiffert Ex. No. 1, § 4.1]. Marek was the sole

---

[5] All citations to the "transcript" in this Memorandum Opinion are actually referring the audio recording of the trial, not a written transcript.

5

member of Classic GP. In this capacity, Marek—and only Marek—had authority to take action for Classic GP, in its capacity as the general partner of Classic.

8. The Agreement forming Classic prohibits a general partner or a limited partner from transferring a general partnership interest without the unanimous consent of all of the general partners and limited partners. [Trustee Ex. No. 1, p.12]. Further, the Agreement prohibits a general partner or a limited partner from transferring a limited partnership interest without the consent of the general partner. [Trustee Ex. No. 1, p. 10].

9. Seiffert is the father of Melanie, Melinda, and Michelle. [Trustee Ex. No. 35, p. 4]; [Trustee Ex. No. 36, p. 5]; [Trustee Ex. No. 37, p. 4–5]. All three daughters are adults who are not dependants of Seiffert.

10. On January 1, 2005, Seiffert gave percentages of his limited partnership interest in Classic to his three daughters. The percentages were divided as follows: Melanie, 15%, Melinda, 15%, and Michelle, 15%. [Joint Ex. No. 1]. Thus, Seiffert's own limited partnership interest decreased from 50% to 5%. [Trustee Ex. Nos. 3, 4, 5]. Classic's internal, unaudited balance sheet dated February 1, 2006 shows that the partnership interests were valued between $13,575.00 and $42,250.00. [Trustee Ex. No. 23, p. 1]. Melanie, Melinda, and Michelle did not participate in any negotiations regarding their respective receipt of the TIRZ receivables from Classic. Although Seiffert's daughters became owners of limited partnership interests, they did not have extensive knowledge of their involvement with Classic.

11. Melanie and Michelle voluntarily appeared at trial to testify at the request of counsel for the Defendants.[6] [June 3, 2008 Tr. 5:28:00–5:28:54]. During the discovery period, the

---

[6] The term "Defendants" refers to those named defendants in this adversary proceeding who did not settle with the Trustee: Seiffert, Michelle, Melanie, Melinda, and PLD.

Trustee and his agents made repeated efforts to serve Melanie with a subpoena so that the Trustee's counsel could depose her. Melanie deliberately evaded the process server who attempted to serve her with the deposition notice and *subpoena duces tecum* by refusing to answer the door when the process server came to her residence. [June 4, 2008 Tr. 3:09:24–3:10:04].

12. In addition to generating cash flow from the sale of developed lots, Classic also sought to increase its cash flow by applying to the City of Houston for authority to utilize Tax Increment Reinvestment Zone reimbursements (TIRZ reimbursements) for infrastructure development. [Seiffert Ex. No. 5].

13. Classic was approved for TIRZ reimbursements under the TIRZ District #10 (Classic TIRZ). Under the provisions of the Classic TIRZ, funds advanced by Classic for public improvements were required to be repaid by the City of Houston to Classic, together with interest at the rate of the prime lending rate of Chase Bank of Texas, plus one percent. The Classic TIRZ further provides that the obligation of the City of Houston and the TIRZ is irrevocably secured by a lien on and pledge of the tax increment. [Seiffert Ex. No. 5].

14. As of February 17, 2005, Classic was entitled to reimbursement under the Classic TIRZ in the amount of $2,020,620.00 (TIRZ receivables). [Seiffert Ex. Nos. 21, 42]. The TIRZ receivables appeared on Classic's ledger on December 31, 2005. [Trustee Ex. No. 34, p. 7].

15. Classic has remained insolvent since April 30, 2005. [Trustee Ex. No. 48, p. 2]. Classic's own balance sheets demonstrate this insolvency. [Trustee Ex. No. 27–29]. Additionally, Warren W. Cole (Cole), an expert witness called by the Trustee, credibly

testified to Classic's insolvency as of April 30, 2005, and at all times thereafter. [June 4, 2006 Tr. 12:29:40–12:29:50]. As part of the research that Cole did to determine whether Classic was insolvent, he performed a balance sheet test to determine insolvency and used what he believed were accurate valuation metrics. [June 4, 2006 Tr. 12:28:30–12:28:49, 12:24:02–12:25:11]. Cole contacted a developer and conducted research on the Internet to arrive at a formula to value the TIRZ receivables. [June 4, 2008 Tr. 12:19:03–12:19:38]. Cole concluded that Classic was insolvent as of April 30, 2005, and at all times thereafter. Further, he testified that his calculation for arriving at his insolvency conclusion was based not only on the "balance sheet test," but also on certain discounting methods.

16. Mendel filed a voluntary Chapter 7 case on October 13, 2005. On the same day, Lowell Cage (Cage) was appointed as the Trustee of the Mendel Chapter 7 estate. [Seiffert Ex. No. 7]. Because Mendel held a 16.666% interest in Classic on the date of the filing of his Chapter 7 petition, Cage, as the Chapter 7 Trustee of Mendel's Chapter 7 estate, took title to this 16.666% interest.[7] [Joint Ex. No. 1].

17. Marek filed a voluntary Chapter 7 case on October 14, 2005. On the same day, Janet Casciato-Northrup (Northrup) was appointed as the Trustee of the Marek Chapter 7 estate. [Seiffert Ex. No. 8]. Because Marek held a 15.666% interest in Classic on the date of the filing of his Chapter 7 petition, Northrup, as the Chapter 7 Trustee of Marek's Chapter 7 estate, took title to this 15.666% interest. [Joint Ex. No. 1].

---

[7] Upon the filing of a Chapter 7 petition, title to all assets of the debtor vests in the Chapter 7 Trustee. *Calvin v. Wells Fargo Bank, N.A. (In re Calvin)*, 329 B.R. 589, 601 (Bankr. S.D. Tex. 2005).

18. HDI filed a voluntary Chapter 7 case on November 17, 2005. On the same day, W. Steve Smith (Smith) was appointed as the Trustee on behalf of the HDI Chapter 7 estate. [Seiffert Ex. No. 9].

19. On February 1, 2006, Classic GP, of which Marek was the sole member, was replaced as Classic's general partner by Classic Holdings, L.L.C. (Classic Holdings). [Joint Ex. No. 1]. This action was done through the written consent of Seiffert, Melanie, Melinda, Michelle, and Mason in their capacities as limited partners of Classic. [Trustee Ex. No. 10]. Neither Cage nor Northrup were given notice of this action despite each holding a limited partnership interest in Classic.

20. Seiffert, by taking certain deliberate actions, replaced Classic GP with Classic Holdings as the general partner of Classic without giving notice to each and every limited partner of Classic. [June 3, 2008 Tr. 4:31:10–4:31:44]. Specifically, Seiffert saw to it that no notice was given to Cage and Northrup despite Seiffert's knowledge that Cage and Northrup were the Chapter 7 Trustees of the Mendel and Marek estates, respectively, who had each taken title to a limited partnership interest in Classic on the dates that Mendel and Marek had filed their Chapter 7 petitions. [June 5, 2008 Tr. 10:08:23–10:08:40]; [Seiffert Ex. No. 14]. Seiffert orchestrated the replacement of Classic GP with Classic Holdings as the general partner of Classic because Marek, as the sole member of Classic GP, was the only person who was authorized to act for this general partner, and Seiffert did not control Marek. The only notice that Seiffert ever provided was to the TIRZ board about the assignments. Seiffert only provided this notice to the TIRZ board only because it was necessary to make the assignments effective. [Trustee Ex. No. 31].

21. The entity that Seiffert created to replace Classic GP—Classic Holdings—is a Texas limited liability company. [Seiffert Ex. No. 3]. Seiffert took actions to ensure that the sole member and president of Classic Holdings was Melanie, one of his daughters. [Joint Ex. No. 1]. Seiffert also saw to it that Classic Holdings had two managers: Melanie and himself. [Joint Ex. No. 1].

22. Seiffert had complete control over Classic Holdings. [Trustee Ex. No. 9]. As managers, either Melanie or Seiffert could take actions on behalf of Classic Holdings without obtaining the other's consent. However, Melanie never took any action on behalf of this entity without the express consent of Seiffert; conversely, Seiffert took unilateral action without obtaining Melanie's consent. Melanie testified at trial that she did not understand the responsibilities of serving as a principal of a company and simply did as her father instructed. [June 4, 2008 Tr. 3:10:53–3:12:48]. Her two sisters also did as their father instructed.

23. Seiffert saw to it that Melanie had 100% ownership of Classic Holdings, but he retained control of this company. [June 3, 2008 Tr. 4:27:46–4:28:26].

24. By a resolution dated and effective February 1, 2006, and signed by Seiffert, Mason, Melanie, Melinda, and Michelle in their capacities as limited partners of Classic, these five individuals elected: (i) Seiffert as Classic's president, secretary, and treasurer; and (ii) Melanie as its vice president. The resolution reflects that Marek's and Mendel's Chapter 7 Trustees—each of whom held a limited partnership interest in Classic—were excluded from the voting process. [Trustee Ex. No. 10]. The resolution also reflects that Marek's powers and rights as the sole member of Classic GP were terminated. Accordingly, the resolution had the effect of terminating Classic GP as the general

partner of Classic.  With the termination of Classic GP as the general partner of Classic, the establishment of Classic Holdings as the new general partner of Classic, the establishment of Seiffert as manager of Classic Holdings, and the election of Seiffert as president of Classic, the way was paved for Classic to transfer the TIRZ receivables to anyone designated by Seiffert.

25. By partial assignment dated February 21, 2006, Classic transferred $400,000 of the TIRZ receivables to Mason.  [June 3, 2008 Tr. 2:03:03].  The assignment was given in exchange for Mason's 16.667% partnership interest in Classic and in repayment of loans that Mason allegedly made to Classic.

26. By partial assignment dated February 21, 2006, Classic transferred $300,000 of the TIRZ receivables to Michelle.  The assignment was given in exchange for Michelle's 15% partnership interest in Classic.  [Trustee Ex. Nos. 3, 22]; [Seiffert Ex. 14].

27. By partial assignment dated February 22, 2006, Classic transferred $300,000 of the TIRZ receivables to Melinda.  The assignment was given in exchange for Melinda's 15% partnership interest in Classic. [Trustee Ex. Nos. 5, 21]; [Seiffert Ex. 14].

28. By partial assignment dated February 22, 2006, Classic transferred $300,000 of the TIRZ receivables to Melanie.  The assignment was given in exchange for Melanie's 15% partnership interest in Classic. [Trustee Ex. Nos. 4, 23]; [Seiffert Ex. 14].

29. By partial assignment dated February 28, 2006, Classic transferred $475,000 of the TIRZ receivables to Seiffert.  The assignment was given in exchange for Seiffert's 5% partnership interest in Classic and, according to Seiffert's testimony, also in satisfaction of $225,000 of back salary allegedly owed to Seiffert and repayment of a $250,000 loan Seiffert claims that he made to Classic.  [Trustee Ex. Nos. 6, 24].  At trial, no credible

documents were introduced evidencing the alleged back salary of $225,000, or what services (covering what period of time) Seiffert provided to Classic to justify this salary. Further, at trial, no credible documents were introduced evidencing the $250,000 loan that Seiffert purports to have loaned Classic. Classic never executed a promissory note evidencing this alleged loan.

30. By partial assignment dated June 28, 2006, Classic transferred $85,000 of the TIRZ receivables to PLD in satisfaction of rent, office expenses, and overhead fees that Seiffert claimed Classic owed to PLD. [Trustee Ex. No. 44]; [Trustee Ex. No. 25]. No negotiations took place regarding this transfer. [June 3, 2008 Tr. 5:09:07–5:11:02]. Melanie, as manager of Partners Land Development, GP, executed this assignment on behalf of PLD. [Trustee Ex. No. 25]. The only document showing the alleged obligations aggregating $85,000 contains no date, lacks the name of the person who prepared the document, itemizes expenses under vague headings and in an unusual order, and comes out to a suspiciously even number even though most lines carry irregular dollar amounts. [Trustee Ex. No. 44]. This document is not credible.

31. By partial assignment on June 28, 2006, Classic transferred $50,000 of the TIRZ receivables to Charles E. Fitch (Fitch). [Trustee Ex. No. 26]. This assignment was given in exchange for what Seiffert claims were attorney's fees owed by Classic to Fitch for services rendered on behalf of Classic; however, no credible documents were introduced evidencing these services.

32. Gene R. Mendel (Gene) allegedly loaned Classic $300,000 on March 10, 2005. By partial assignment dated June 15, 2006, Classic transferred $300,000 of the TIRZ

receivables to Gene.  The assignment was given to satisfy the balance of this purported loan made by Gene to Classic.  [Seiffert Ex. No. 25].

33. Classic transferred a total of $2,210,000.00 in TIRZ receivables.  [Trustee Ex. Nos. 21–26].  The assignments were absolute, not conditional. Seiffert and his daughters still own the TIRZ receivables which Classic transferred to them.  [June 3, 2008 Tr. 5:23:12–5:25:30].  At trial, Seiffert indicated that no money has yet been paid with respect to the TIRZ receivables that his daughters, PLD, and he owns.  [June 3, 2008 Tr. 5:23:12–5:25:30].

34. At no point did Seiffert notify either Cage or Northrup about the assignments of the TIRZ receivables made by Classic to Seiffert, Melanie, Michelle, Melinda, PLD, Mason, Gene, and Fitch.  [June 3, 2008 Tr. 10:29:58–10:30:08; 10:51:54–10:52:10].

35. Through Classic's assignments of $300,000 of TIRZ receivables each to Melinda and Michelle, both of these individuals were aware that they were receiving a substantial asset without having performed any work.  [June 3, 2008 Tr. 3:38:00–3:52:21]; [June 4, 2008 Tr. 3:10:43–3:16:18]; [June 4, 2008 Tr. 3:23:11–3:23:22].  Seiffert and all of his daughters failed to disclose in their tax returns the transfer of their limited partnership interests in Classic in exchange for the assignment of the TIRZ receivables.  [Trustee Ex. No. 51–53].

36. According to testimony at trial, Classic was insolvent during each and every one of Classic's assignments of the TIRZ receivables to Seiffert, Melanie, Michelle, Melinda, PLD, Mason, Gene, and Fitch.  [June 4, 2006 Tr. 12:29:40–12:29:50].  The written report of Cole also shows that Classic was insolvent at these times.  [Trustee Ex. No. 48].

37. On February 6, 2007, Cage and Northrup, on behalf of Mendel and Marek's bankruptcy estates, filed an involuntary bankruptcy petition against Classic. [Docket No. 230, p. 3]; [Docket No. 234, p. 4]. Classic failed to answer the involuntary petition, and on March 15, 2007, this Court entered an order for relief under Chapter 7 against Classic. [Seiffert Ex. No. 10]. At trial, Seiffert acknowledged that both Cage and Northrup held limited partnership interests in Classic, but he could not provide a satisfactory explanation as to why he failed to give them notice of the creation of Classic Holdings and of Classic's assignments of the TIRZ receivables to Seiffert, Melanie, Michelle, Melinda, PLD, Gene, Mason, and Fitch. [June 3, 2008 Tr. 5:14:18–5:16:05]. When asked why he failed to give Cage and Northrup notice, Seiffert initially testified that "my attorneys told me that they didn't have to notify the trustees." However, after counsel for the Trustee pressed him on this issue, Seiffert responded with a long pause, and lamely replied "I don't know."

38. On March 15, 2007, William West (West) was appointed the Trustee of Classic's Chapter 7 estate. [Seiffert Ex. No. 11].

39. On June 2, 2006, Gulf Coast Bank & Trust Company (the Bank) filed this adversary proceeding against Classic, Classic GP, Seiffert, Mason, Melanie, Melinda, Michelle, and Gene.[8] [Docket No. 71].

40. According to the schedules filed in Classic's case, which were signed by Seiffert, the total value of Classic's assets, as of the filing of the involuntary petition, would have

---

[8] The original complaint lists Classic GP even though on February 1, 2006, Classic Holdings had replaced Classic GP as the general partner of Classic. [FOF 24]. The Bank sued Classic GP instead of Classic Holdings because the Bank, like Cage and Northrup, had no idea that Classic Holdings had replaced Classic GP.

been $1,320,000 if Classic had not assigned the $475,000 TIRZ receivable to Seiffert, and had also not assigned the $85,000 TIRZ receivable to PLD. [Seiffert Ex. No. 35].

41. By Order dated May 2, 2007, this Court substituted West as the true plaintiff in this adversary proceeding and realigned the parties, including removing Classic and Classic GP as defendants. [Adversary Docket No. 159]. Thereafter, on June 18, 2007, West filed an Amended Complaint. [Adversary Docket No. 169].

42. After filing the Amended Complaint, West settled with three of the defendants: Fitch, Gene, and Mason. [Adversary Docket Nos. 170, 225, and 189].

43. The Trustee sued Mason for $400,000 and subsequently settled with him for $250,000. [June 3, 2008 Tr. 2:02:40–2:03:20]. This settlement resulted in a deficiency of $150,000 (the Mason Deficiency).

44. The Trustee sued Gene for $300,000 and subsequently settled with him for $100,000. [June 3, 2008 Tr. 2:03:20–2:03:42]. This settlement resulted in a deficiency of $200,000 (the Gene Deficiency).

45. The Trustee sued Fitch for $50,000 and subsequently settled with him for $25,000. [June 3, 2008 Tr. 2:05:30–2:05:55]. This settlement resulted in a deficiency of $25,000 (the Fitch Deficiency).

46. In this adversary proceeding, West seeks to recover from Seiffert, Melanie, Melinda, Michelle, and PLD the following: (a) all of the TIRZ receivables that Classic assigned to Seiffert, Michelle, Melanie, Melinda, and PLD; (b) the Gene Deficiency, the Mason Deficiency, and the Fitch Deficiency; (c) interest on the amounts described in (a) and (b); and (d) the attorney's fees and costs incurred by West in prosecuting this adversary proceeding. [Docket No. 234, p. 12–13].

47. West asserts causes of action under: (a) 11 U.S.C. § 547 (against solely Seiffert and PLD); (b) TUFTA (against Seiffert, Melanie, Melinda, Michelle, and PLD); (c) 11 U.S.C. § 548 (against Seiffert, Melanie, Melinda, Michelle, and PLD); and (d) the common law (against Seiffert and Melanie) for violations of fiduciary duties. [Docket No. 234, p. 2].

48. As of February 1, 2006, Classic's only assets were real estate and the TIRZ receivables. [Seiffert Ex. No. 23, p. 1]; [Trustee Ex. No. 29, p. 1]. Classic had no equity in the real estate that it owned, as the value of the real estate was less than the amount of liens on this property. The TIRZ receivables were the only material assets that were unencumbered. [Seiffert Ex. 23, p. 1].

49. After the real estate was foreclosed upon, Classic was left with the TIRZ receivables as its sole material asset. [June 4, 2008 Tr. 9:26:34–9:29:40].

50. Classic's balance sheets dated December 31, 2004, December 31, 2005, and December 31, 2006 all reflect that Classic was woefully insolvent. [Trustee Ex. Nos. 27–30]. Seiffert kept Classic's books. [June 5, 2008 Tr. 10:16:07–10:16:17].

51. Classic incurred a debt of $53,869.95 to the law firm of Chamberlain, Hdrlicka, White, Williams & Martin between September 7, 2006 and November 15, 2006. This debt was for services rendered by this firm in a lawsuit. [Seiffert Ex. No. 24, p. 5]. Aside from this suit (which Classic initiated), no other suit had been threatened against Classic.

52. Because Fitch, Marek, and Gene have previously settled for a total amount of $375,000, the Trustee still seeks $1,835,000, plus interest, to be made whole. [Docket No. 169, p. 14].

53. There is no credible documentation in evidence which demonstrates the work which Seiffert claims to have performed in consideration of his claimed salary of $225,000.[9] [Trustee Ex. No. 20; Seiffert Testimony 4:25:42].   Similarly, there is no credible documentation relating to the $250,000 loan which Seiffert claims to have made to Classic.

## III.   Credibility of Witnesses

At trial, the Court heard testimony from 11 witnesses:   William West, Janet Casciato-Northrup, Lowell Cage, Matt L. Seiffert, Michelle C. Seiffert, Melanie K. Durant, Warren Cole, Gary Mendel, Ron Tripolet, George W. Connelly, Jr., and Bill Calderon.   The Court finds that William West, Janet Casciato-Northrup, Lowell Cage, Michelle C. Seiffert, Warren Cole, Gary Mendel, Ron Tripolet, George W. Connelly, Jr., and Bill Calderon forthrightly and responsively answered the questions posed to them on both direct examination and cross-examination.   The Court finds their testimony to be credible.   On the other hand, there were two witnesses whose testimony lacked credibility:   Matt Seiffert and Melanie Durant.

Set forth below are the Court's findings regarding the credibility of Seiffert and Melanie.

### A.   Matt L. Seiffert

Seiffert gave extensive testimony.   He was frequently evasive and refused, on various occasions, to concede the obvious.   For example, he made every effort to avoid admitting that he has a criminal conviction for filing false tax returns.   With respect to this conviction, Seiffert gave the following testimony:

---

[9] Although Seiffert puts forth supposed documentation, this Court finds the purported documentation of the salary and loan to be wholly insufficient due to the fact that it was both for Seiffert's own benefit and only signed by Seiffert.   Trustee Exhibit 20, which the Trustee obtained during discovery, purports to document unpaid salary owed to Seiffert and an unpaid loan made by Seiffert to Classic.   However, Seiffert claims that this "salary" and this "loan" arose from an agreement between Seiffert and Classic dated February 24, 2006.   Four days later, on February 28, 2006, the document was notarized.   February 28, 2006 is also the date that $475,000 in TIRZ receivables was transferred from Classic to Seiffert.   This documentation is not sufficient and is highly suspect.

[Counsel for Trustee]  Just to get this out of the way Mr. Seiffert, you are currently on probation, correct?

[Matt Seiffert]  Yes, sir.

Q  And it is for a March conviction for filing a false tax return, correct?

A  I pled guilty to owing $19,000 for the year 2000.

Q  You were convicted for filing false tax returns, were you not?

A  I guess.

Q  Do you know what you were convicted of?

A  That I owed $19,000 in income taxes.

Q  No, you weren't convicted for owing taxes.  You were convicted for filing false tax returns, were you not?

A  I guess.

Q  Now, I don't want to guess.  Were you or were you not?

A  The way I had in my mind is that they said I owed $19,000 worth of taxes, so I paid it and plead guilty to it.

[June 3, 2008 Tr. 4:17:10–4:18].

At this point, counsel for the Trustee gave Seiffert a copy of the judgment entered against him, and then continued the cross-examination:

[Counsel for Trustee]  That is a judgment entered in a criminal case, *United States of America vs. Matt L. Seiffert*, correct?[10]

[Matt Seiffert]  Yes, sir.

Q  That is you, correct?

A  Yes, sir.

---

[10] Counsel for the Trustee was showing Seiffert Trustee Ex. No. 47, Judgment in Case of *United States of America vs. Matt L. Seiffert*, 4:05CR00003-001.

Q  And the nature of the offense, halfway down, subscribing to a false United States individual income tax refund, Form 10-40.  Does that help you remember what you were convicted of?

A  That is exactly what it says.

Q  Does that help you remember what crime you committed?

A  Okay.

Q  Does it, or doesn't it?

A  That is exactly what it says.  A false individual income tax return.

[June 3, 2008 Tr. 4:18:23–4:19:03].

Aside from attempting to dodge the truth about his conviction for filing a false tax return,[11] Seiffert also tried to skirt giving truthful and complete answers to questions posed to him about key issues in the suit at bar.  For example, when asked about his control of Classic Holdings—which counsel for the Trustee referred to as the "new GP"—Seiffert made a flimsy attempt to convince this Court that his daughter, Melanie, not he, was in control:

[Counsel for Trustee]  So when you hired the New GP, which is essentially a company owned by you and your daughter, correct?

[Matt Seiffert]  It's owned by her.

Q  Owned by her?

A  I'm a manager.

Q  Controlled by you.

A  I'm a manager.

Q  Managers control, right?

---

[11] After Seiffert unsuccessfully attempted to evade questions about his conviction for filing a false income tax return, he decided to concede, without equivocation, that he also had been convicted of bank fraud.  [June 3, 2008 Tr. 4:19:05–4:19:10].

A   Yes, we're both managers.

Q   So when you hired a New GP-

[The Court]:  Let me just stop for a minute.  I don't think I got an answer to that question. Are you in control?  You said you were a manager.  Question put to you is, are you in control of Classic Holdings, LLC?  That is a yes or no answer.

[Matt Seiffert]:  Well, the answer would be not a hundred percent.  No, sir.

[The Court]:  Alright, thank you.

[Counsel for Trustee]:  Well, Mr. Seiffert, as a manager under the partnership agreement or under the LLC agreement, you have the right to take any action, on behalf of the company, as a manager of the company, do you not?

[Matt Seiffert]:  I'm one of two people, yes sir.

Q   That wasn't my question.  You have the authority to act on behalf of the company as a manager, correct?

A   Yes.

[June 3, 2008 Tr. 4:27:46–4:28:49].

Thus, Seiffert initially attempted to convince this Court that he could not take unilateral actions on behalf of Classic Holdings and that his daughter, Melanie, had to give input.  That is why, in response to the question as to whether he was in control of Classic Holdings, he responded: "Well, the answer would not be a hundred percent.  No, sir."  It was only after counsel for the Trustee pushed on this issue—specifically, by asking Seiffert whether he alone had authority to act on behalf of Classic Holdings—that Seiffert responded in the affirmative without attempting to equivocate.  It is this sort of evasiveness that undermines Seiffert's credibility.

By way of further example of his unwillingness to give forthright answers, Seiffert gave inconsistent testimony about another basic point:

[Counsel for Trustee]  Mr. Seiffert, let's turn over to Trustee exhibit 7.  Does that help you understand or remember the name of the entity that you formed?  Right there on the first page.

[Matt Seiffert]  Yeah, I guess the official name is Classic Holdings, LLC.  And they are the general partner.

Q Alright.  Owned by your daughter, which you are president and manager of, correct?

A Yes, sir.

Q Alright.  We can agree on that. . . .

<Approximately 15 minutes later>

[Counsel for Trustee]  Do you even know who the President of Classic Holdings, LLC is today, for sure?

[Matt Seiffert]  Yeah, according to Exhibit Number 9 it's Melanie.

Q Which is different than what you swore to, under oath, 15 minutes ago.

A Well, if I said it, I was mistaken.

[June 3, 2008 Tr. 4:30:32–4:31:06; 5:03:24–5:03:42].

Further, when examined about the partial assignments of the TIRZ receivables which Classic made to Melinda, Michelle, Melanie, and himself, Seiffert continuously attempted to evade answering questions from the Trustee's counsel and ended up contradicting himself:

[Counsel for Trustee]  So, would you agree with me that none of your daughters engaged in a negotiation of what they would get in exchange for what they would give up?  Would you agree with me there?

[Matt Seiffert]  No.  I would say there was no heated negotiations.  It was told to them and they signed the agreement.

Q I want to make sure that I understood what you told me.  I actually didn't hear you. Did you tell me that in fact there were no negotiations?

A I said there was not any long, drawn out negotiations.

Q Were there any at all?  Because you heard them testify they had nothing to do with it. They didn't know what you had done.

21

A  No, they never operated Classic, I did.

Q  Alright, so there were no, there were no negotiations, were there?  There were none. You decided what was gonna happen.

A  Yes, I told them I computed the price for their interest that I had given them and –

Q  Mr. Seiffert, why is it that you want to tell me that there were no heated negotiations, when in fact there were none?  Why can't you just tell me the truth?  There were no negotiations.

A  They signed the document.  So to say they never saw the document would be a lie, Mr. Jones.[12]

Q  Who said they never saw the document, Mr. Seiffert?  I asked you if there were any negotiations?  Were there?  Yes or no?  It's a simple question.

A  Yeah, there were discussions about the document.

Q  With who?

A  With each of the daughters.

Q  Why is it they told me under oath that they had no idea?  They couldn't even recall the document.

A  I can't answer for them.  I can tell you what happened at the time that it was presented to them.  The interest that I gave you in Classic, you are now selling, this is what you're getting.  I can't tell you the date it's gonna be paid, but here is the dollar amount and please sign it.

Q  You told them that they were selling?

A  Yes.

Q  Did you give them an option?

A  I don't believe so.

[June 3, 2008 Tr. 5:09:07–5:11:02].

---

[12] David Jones is Counsel for the Trustee.

The above dialogue between Seiffert and counsel for the Trustee once again illustrates Seiffert's unwillingness to be truthful. His initial answer to the Trustee's question as to whether any of his daughters conducted negotiations over the assignments of the TIRZ receivables was that "there was [sic] no heated negotiations." Thus, Seiffert attempted to convince this Court that his daughters in fact conducted negotiations, but that these talks were simply not acrimonious. It was only after the Trustee spent more time bearing down on Seiffert's answer that Seiffert conceded that he gave no options to his daughters and that they simply signed the documents effectuating the transfers.

All in all, Seiffert's credibility with this Court is virtually nil. He simply is unwilling to be forthright and honest in his answers.

### B. Melanie K. Durant

Melanie did not give extensive testimony. However, while she was on the stand, she was somewhat evasive and as taciturn as her father. The Court finds her to be less than completely credible in her testimony.

## IV.    Conclusions of Law

### A.    Jurisdiction and Venue

This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b). This dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (F), (H), and (O). Venue is proper under 28 U.S.C. § 1409(a).

### B.    Overall conclusion regarding the Trustee's § 547 cause of action: the transfers at bar are avoidable.

11 U.S.C. § 547 concerns transfers that were made to creditors of the debtor. Accordingly, this particular section of the opinion focuses only on Classic's assignments of the

TIRZ receivables to Seiffert and PLD, as only those two Defendants claim to have been creditors of Classic.

The assignments made by Classic to Seiffert and PLD are avoidable if the Trustee can satisfy all the elements required by 11 U.S.C. § 547(b).[13]  11 U.S.C. § 547(b) states:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property-

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made-

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer was an insider;

(5) that enables such creditor to receive more than such creditor would receive if-

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Classic, acting by and through its president, Seiffert, transferred an interest in property of the Debtor when it executed the documentation assigning the TIRZ receivable to PLD and Seiffert.  [FOF 29-30].  Furthermore, the transfer was made to benefit creditors: Seiffert (to whom money was allegedly owed for a loan made by Seiffert to Classic and for alleged unpaid

---

[13] The Trustee bears the burden of proof under § 547(b).  *In re Ramba, Inc.*, 437 F.3d 457, 460 (5th Cir. 2006) (citing *Warsco v. Preferred Technical Group*, 258 F.3d 557, 564 (7th Cir. 2001)); *In re Flanagan*, 503 F.3d 171, 180 (2d Cir. 2007) (citing *Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*) 78 F.3d 30, 34 (2d Cir. 1996)).

salary owed to Seiffert) and PLD (to whom rent and various other expenditures were allegedly owed). [FOF 29–30]. These obligations were antecedent debts, as they were allegedly incurred prior to the filing of Classic's Chapter 7 petition.[14]  Moreover, the Debtor was insolvent at the time of the transfers, as the amount of its debts exceeded the value of its assets. [FOF 15, 36].

Additionally, Classic, by and through its president, Seiffert, made the transfers on the following dates:  February 28, 2006 to Seiffert, and June 28, 2006 to PLD. [FOF 29–30]. These two dates are both within the one-year period prior to the filing of Classic's involuntary petition (which was February 6, 2007). [FOF 37].  As a result of these transfers, the creditors (Seiffert and PLD) received more than what they would have received if the transfers had never been made and distributions were made to them in a Chapter 7 case pursuant to the applicable provisions of Title 11.

1.    **The first element of § 547(b):  assignments of the TIRZ receivables to PLD and Seiffert were transfers of property of Classic.**

According to 11 U.S.C. § 101(54), the term "transfer" includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D).

The transactions at bar involve assignments of the TIRZ receivables to Seiffert and PLD. Hence, there are two questions: (1) Are the TIRZ receivables property of Classic?; and (2) Do the assignments to Seiffert and PLD constitute transfers?

---

[14] The Court uses the word "allegedly" when referring to the claims held by Seiffert and PLD because it was Seiffert who testified at trial about the existence of these claims and this Court—as previously noted in the "Credibility of Witnesses" section of this Opinion—is highly skeptical of Seiffert's ability and willingness to tell the truth. Moreover, there is a dearth of documents kept in the ordinary course of Classic's business evidencing how these claims came into existence.  Nevertheless, for purposes of the analysis under § 547, this Court will assume that the debts allegedly owed by Classic to Seiffert and PLD were in fact legitimately created and actually owing as of the date of the filing of Classic's involuntary petition.

"In order to ascertain whether certain monies constitute property of the debtor the Court must determine whether the debtor had an interest in the funds such that a transfer thereof would result in a diminution of the estate." *In re Jaggers,* 48 B.R. 33, 36 (Bankr. W.D. Tex. 1985) (citing *Continental Trust Co. v. Chicago Title Co.,* 229 U.S. 435 (1913)). Classic applied, and was approved, for the TIRZ reimbursement in 2005. [FOF 12–14]. These receivables thereafter appeared on Classic's financial statements. [FOF 14]. Accordingly, the TIRZ receivables were property of Classic.

As to whether Classic's assignments of the TIRZ receivables to Seiffert and PLD constitute transfers, Texas law is clear that "an assignment 'is a manifestation to another person by the owner of a right indicating his intention to transfer, without further action or manifestation of intention, his right to such other person or third person.'" *Harris Methodist Fort Worth v. Sales Support Servs. Inc. Employee Health Care Plan,* 426 F.3d 330, 334 (5th Cir. 2005) (quoting *Wolters Village Mgmt. Co. v. Merchants & Planters Nat'l Bank of Sherman,* 223 F.2d 793, 798 (5th Cir. 1955)). In the suit at bar, Classic, by and through its president, Seiffert, voluntarily and willfully parted with the TIRZ receivables by executing the partial assignments to PLD and himself. [FOF 29–30]. Both of these partial assignments manifested the intent of Classic to convey title of the TIRZ receivables to PLD and Seiffert. Under these circumstances, the partial assignments constitute transfers as defined under 11 U.S.C. § 101 (54)(D).

At trial, counsel for the Defendants suggested that no transfer had yet occurred because his clients had not yet received payment of the TIRZ receivables. [FOF 33]. That is not the law. "[A] transfer occurs on the date the contractual right to payment is assigned, not on the date payment is actually made or collected." *In re Gibraltar Res., Inc.,* 197 B.R. 246, 250 (Bankr. N.D. Tex. 1996) (quoting *In re Adventist Living Ctrs., Inc.,* 174 B.R. 505, 512 (Bankr. N.D. Ill.

1994)). Thus, in the suit at bar, the transfers to Seiffert and PLD occurred on February 28, 2006, and June 28, 2006, respectively. [FOF 29–30]. It is of no moment that PLD and Seiffert have not yet received cash.

Under the circumstances described above, the Court concludes that the Trustee has satisfied the first element of § 547(b).

2.  **The second element of § 547(b): The $475,000 owed to Seiffert as unpaid salary and repayment on a loan and the $85,000 owed to PLD as payment for unpaid rent were antecedent debts owed by the Debtor.**

The first transfer was Classic's assignment to Seiffert for $475,000 made on February 28, 2006. [FOF 29]. Of the $475,000, Seiffert testified that (a) $225,000 was unpaid salary owed to him by Classic; and (b) the remaining $250,000 was a loan that he had made to Classic. [FOF 29]. Seiffert's testimony was that these particular debts owed to him arose prior to Classic's assignment to him of the $475,000 TIRZ receivable. [FOF 29]. Accordingly, this Court concludes that these particular obligations were antecedent debts owed by the Debtor to Seiffert.

The second transfer was Classic's assignment to PLD for $85,000 made on June 28, 2006 in satisfaction of alleged past due rental obligations, overhead fees, and office expenses owed by Classic to PLD. [FOF 30]. Seiffert testified that this particular debt arose prior to Classic's assignment to PLD of the $85,000 TIRZ receivable. [FOF 30]. Accordingly, this Court concludes that this particular rental obligation, overhead fee, and office expense were antecedent debts owed by the Debtor.

Under the circumstances described above, the Court concludes that the Trustee has satisfied the second element of § 547(b).

3.    **The third element of § 547(b):  the Debtor was insolvent at the time of the transfers of the TIRZ receivables from the Debtor to Seiffert and to PLD.**

a.    **The Trustee has the burden of proof on this issue because the transfers in question were made more than ninety days prior to the filing of the involuntary petition against Classic.**

11 U.S.C. § 547(f) states that "[f]or purposes of this section, the debtor"—here, Classic—"is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition."  However, because the transfers in question—the February 28, 2006 transfer to Seiffert and the June 28, 2006 transfer to PLD—occurred more than 90 days preceding the date of the filing of Classic's petition, [FOF 29–30], this presumption of insolvency is inapplicable; therefore, the Trustee has the burden of proving Classic's insolvency on the dates of these transfers by a preponderance of the evidence.  *Orix Credit Alliance, Inc. v. Harvey* (*In re Lamar Haddox Contractor, Inc.*), 40 F.3d 118, 121 (5th Cir. 1994).

b.    **Pursuant to Federal Rule of Evidence 702, the testimony of the Trustee's expert witness, together with this expert's written report, should be admitted.**

The issue of insolvency involved testimony given by the Trustee's expert witness, Cole. The Defendants objected to Cole testifying as an expert because he has no experience valuing receivables created by City of Houston Tax Increment Reinvestment Zone # 10.  Moreover, the Defendants contended Cole's methodology with regard to the TIRZ receivables should disqualify him as an expert in this suit.

In response, the Trustee maintained that Cole is qualified as an expert in the area of business valuation and insolvency because he:

- Has 37 years experience as a Certified Public Accountant;
- Is a Certified Valuation Analyst;
- Is accredited in business valuation;

- Has testified as an expert witness to economic damages and business valuation in over 150 commercial litigation cases involving multiple industries; and
- Has served as a consultant to more than 30 insolvent companies.

To resolve the Defendants' objection to Cole being allowed to testify as an expert witness on the subject of insolvency, the Court turns to Federal Rule of Evidence 702, which states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In applying Rule 702, a bankruptcy court judge has discretion to admit evidence which is "reliable and relevant." *Kozak v. Medtronic, Inc.*, 512 F. Supp. 2d 913, 917–18 (S.D. Tex. 2007). The Fifth Circuit has held that "to qualify as an expert, the witness must have such knowledge or experience in [his or her] field or calling as to make it appear that his opinion will probably aid the trier in his search for truth." *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)). An expert's testimony is admissible even though the expert possesses general rather than specific experience with the subject matter. *See Wechsler v. Hunt Health Sys., Ltd.*, 381 F. Supp. 2d 135, 143 (S.D.N.Y. 2003) (qualifying a certified public accountant with 17 years experience as an expert on the issue of insolvency despite lack of prior experience in the health care industry or experience analyzing healthcare receivables).

The Defendants' objection to Cole's qualifications ignores the admissibility of his extensive accounting experience and essentially focuses on Cole's credibility as a witness regarding the TIRZ receivables. Although Cole lacks specific experience in valuing a TIRZ

receivable with respect to TIRZ # 10, he contacted a developer and conducted research to arrive at a formula to interpret and value the TIRZ receivables in the suit at bar. [FOF 15].

Further, the Defendants contend that Cole used an inappropriate appraisal methodology because he relied upon an April 20, 2007 appraisal performed by the Greenbriar Appraisal Company instead of a January 2006 appraisal. If true, the allegation that Cole's use of the 2007 appraisal inaccurately depicts Classic's TIRZ receivables once again goes to the weight, and not to the admissibility, of his testimony. *See MCorp Fin., Inc. v. Harris County (In re MCorp Fin., Inc.)*, 216 B.R. 596, 599 (Bankr. S.D. Tex. 1996) (holding that the fact that a real estate appraiser had not appraised real property in Houston for several years went only to the weight and not the admissibility of the testimony).

Cole's experience as a C.P.A., his business valuation accreditations, and his lengthy history as an expert witness on issues regarding business solvency make his testimony both reliable and relevant to this proceeding. Defendants have raised objections that more aptly go to the weight of Cole's expert testimony and not to the question of admissibility. The Court therefore concludes that Cole is qualified as an expert witness to give testimony about Classic's insolvency, which necessarily includes giving testimony about the value of Classic's assets, including the TIRZ receivables.

> **c.      Both documentary evidence and Cole's testimony serve as independent grounds for this Court's conclusion that Classic was insolvent at the time of the assignments made to Seiffert and PLD.**

"The bankruptcy court has broad discretion when considering evidence to support a finding of insolvency." *Heilig-Meyers Co. v. Wachovia Bank, N.A. (In re Heilig-Meyers Co.)*, 328 B.R. 471, 475 (E.D. Va. 2005). For purposes of establishing insolvency under 11 U.S.C. § 547, "[a] corporate debtor is insolvent when its 'financial condition [is] such that the sum of [its] debts is greater than all of [its] property, at a fair valuation.'" *Lamar Haddox*, 40 F.3d at

121 (quoting 11 U.S.C. § 101(32)(A)).  The transfer made to Seiffert was executed on February

28, 2006, and the transfer to PLD was executed on June 28, 2006.  [FOF 29–30].  Classic's own

balance sheet shows that Classic's liabilities exceeded its assets on or about each of these two

dates; therefore, Seiffert, who testified that he himself kept Classic's books [FOF 50], can hardly

challenge the accuracy of this conclusion.

     Moreover, the Trustee's expert, Cole, testified that Classic was insolvent at the time of

these transfers.  [FOF 15].  While the Defendants complained about Cole's methodology, this

Court would emphasize that "[i]nsolvency is determined by reference to § 101(29) [now §

101(32)] of the [Bankruptcy] Code, which employs the balance sheet test for insolvency."  *Willis*

*v. Borg-Warner Acceptance Corp.* (*In re Willis*)*,* 48 B.R. 295, 301 (S.D. Tex. 1985).  "The fair

value of property is determined by estimating what the debtor's assets would realize if sold in a

prudent manner in current market conditions. A balance sheet . . . shows the book value of assets

usually valued at the cost of the property minus accumulated depreciation at the maximum rate

allowed by income tax regulations."  *In re Titanis, Inc.*, No. 05-30548 2008 WL 1924282, at *2

(Bankr. S.D. Tex. May 1, 2008) (citing *Lamar Haddox,* 40 F.3d at 122).

     Cole testified that he concluded that Classic was insolvent as of April 30, 2005 and at all

times thereafter.  [FOF 15].  This calculation was not only based on the "balance sheet test," but

also based on certain discounting methods.  [FOF 15].  Because Cole not only adhered to the

"balance sheet test," but went above and beyond the balance sheet test, to properly value

Classic's assets and liabilities, this Court concludes that Cole and his methods are highly credible

and that Classic was insolvent at the time of the transfers in question.  [FOF 15].

     The Court would also note that the Defendants provided no expert testimony

controverting Cole's testimony.  To the extent that Seiffert gave any testimony about Classic

ever being solvent, this Court rejects this testimony because Seiffert's credibility is highly questionable, and he lacks the expertise required to testify about this subject.   Under the circumstances described above, the Court concludes that the Trustee has satisfied his burden of proof that Classic was insolvent on the dates that the assignments to Seiffert and PLD were made. The Trustee has satisfied the third element of § 547(b).

**4.      The fourth element of § 547(b): the Debtor made transfers between ninety days and one year before the date of the filing of Classic's involuntary petition, and the creditors (i.e. Seiffert and PLD) were both insiders.**

A transfer made "between ninety days and one year before the date of the filing of the petition [may be fraudulent] if such creditor at the time of such transfer was an insider."   11 U.S.C. § 547(b)(4)(B).  The assignment of the $475,000 TIRZ receivable to Seiffert occurred on February 28, 2006, and the assignment of the $85,000 TIRZ receivable to PLD occurred on June 28, 2006.   [FOF 29–30].   Because Classic's involuntary bankruptcy petition was filed on February 6, 2007 [FOF 37], the two challenged assignments took place within the statutory window of between ninety days and one year prior to the filing of Classic's petition.  Thus, the first prong of the fourth element is satisfied.

The second prong is whether the two creditors, Seiffert and PLD, are "insiders."  Classic is the Debtor and assignor to Seiffert and PLD, as assignees. [FOF. 29–30].   Classic is a partnership and therefore the applicable definition of "insider" is found within 11 U.S.C. § 101 (31)(C).  This section states that parties to a transfer are insiders if they fall into any of the following categories: "(i) general partner in the debtor; (ii) relative of a general partner in, general partner of, or person in control of the debtor; (iii) partnership in which the debtor is a general partner; (iv) general partner of the debtor; or (v) person in control of the debtor."

Seiffert became President of Classic on February 1, 2006. [FOF 6]. He was in control of Classic. [FOF 6]. He was also in control of Classic Holdings, the general partner of Classic. [FOF 21, 22]. In his capacity as the manager of Classic Holdings, he transferred Classic's property (i.e. the $475,000 TIRZ receivable) to himself. [FOF 22, 24, and 29]. Seiffert is therefore the epitome of an insider; he was funneling money from the entity of which he was president directly into his own pockets. There is no question that Seiffert is an insider pursuant to 11 U.S.C. § 101 (31)(C)(v).

The remaining question is whether PLD is an insider. "Insiders specifically listed in the Bankruptcy Code are insiders *per se*." *Countryman v. Eisner (In re Eisner)*, No. 05-44474, 2007 WL 2479654, at *8 (Bankr. E.D. Tex. Aug. 28, 2007) (emphasis in original) (citing *Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992)). "However, the statutory definition is not limiting and must be flexibly applied on a case-by-case basis." *Lynn v. Continental Bank, N.A. (In re Murchison)*, 154 B.R. 909, 911 (Bankr. N.D. Tex. 1993) (citing *Wilson v. Huffman (Matter of Missionary Baptist Foundation of Am., Inc.)*, 712 F.2d 206, 210 (5th Cir. 1983)). "The cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the transferee [i.e. PLD] and the debtor [i.e. Classic]; and (2) whether the transactions between the transferee and the Debtor were conducted at arm's length." *Holloway*, 955 F.2d at 1011.

Seiffert is a limited partner of Classic and owns 5% of this partnership; he is also the president of Classic. [FOF 6, 10]. Melanie is a limited partner of Classic and owns 15% of this partnership. [FOF 10]. Melanie is also manager, president, and sole member of Partners Land Development GP, LLC—which is the general partner of PLD. [FOF 2]. Seiffert has also

admitted to being a partner in PLD, having a 65% interest. [FOF 2]. Furthermore, Seiffert is Melanie's father. [FOF 9]. The fact that Seiffert is a principal in name—and **the** principal in reality—of both Classic and PLD, combined with the father-daughter relationship between Seiffert and Melanie, leads this Court to conclude that there is substantial "closeness" between Classic (the transferor) and PLD (the transferee) so as to establish PLD as an insider. *Holloway*, 955 F.2d at 1011 ("insider status may be based on a professional or business relationship with the debtor, in addition to the Code's *per se* classifications, where such relationship compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain advantage attributable simply to affinity rather than to the course of business dealings between the parties") (quoting *In re Friedman*, 126 B.R. 63, 70 (9th Cir. B.A.P. 1991)); *see also* 11 U.S.C. § 101(31)(C)(ii).

Further, there is more than ample reason to believe that the dealings between PLD and Classic were not at arm's-length. Seiffert conceded that there were no negotiations regarding the assignment of the $85,000 TIRZ receivable from Classic to PLD. [FOF 30]. Additionally, his daughter, Melanie, acting in her capacity as manager of the general partner of PLD, executed the assignment agreement for the benefit of PLD. [FOF 30]. She testified at trial that she did not understand the responsibilities of serving as a principal of a company. [FOF 22]. She further testified that her father directed her actions and that she did as he instructed her. [FOF 22]. Given these facts, the Court concludes that the assignment of the $85,000 TIRZ receivable from Classic to PLD was not an arm's-length transaction.

Accordingly, under the circumstances described above, the Court concludes that PLD is an insider. The Trustee has satisfied the fourth element of § 547(b).

5.   **The fifth element of § 547(b):  Classic made transfers which enabled the two creditors—Seiffert and PLD—to receive more than if the transfers had not been made and Seiffert and PLD received payment of the debts owed to them in a Chapter 7 case to the extent provided by the applicable provisions of the Bankruptcy Code.**

The fifth element involves an analysis of a hypothetical situation.  The Trustee must show that the transfers to Seiffert and PLD of the TIRZ receivables of $475,000 and $85,000, respectively, enabled these two creditors to receive more than they would have received if: (a) the transfers had not been made; and (b) a Chapter 7 Trustee had paid their claims pursuant to the same provisions of the Bankruptcy Code applicable to payment of all other similarly-situated claims (which, in this instance, are general unsecured claims).[15]

Two creditors were paid in full from the assets of Classic—Seiffert in the amount of $475,000.00 and PLD in the amount of $85,000.00.  [FOF 29–30].  These transfers total $560,000.00.  All other unsecured claims remain unpaid; these claims total $3,033,476.60.[16] Thus, if the transfers to Seiffert and PLD had not been made, the total amount of unsecured claims would be $3,593,476.60.[17]  Assuming that the transfers had not been made, the value of assets returned to the estate would have been $560,000.00.  Accordingly, the total assets of Classic would be $1,320,000.00.[18]  [FOF 40].

---

[15] There is no credible documentary evidence establishing that the debts allegedly owed by Classic to Seiffert and PLD are secured debts.  Accordingly, this Court assumes, for purposes of this analysis, that these debts are general unsecured obligations.

[16] Attached as Exhibit A is the list from the proof of claim register reflecting the ten individuals or entities that have filed unsecured claims.  These ten claims total $3,033,476.60 in the aggregate.  No objections have been filed challenging the validity of any of these ten proofs of claim.  Accordingly, all ten claims are presumptively valid, *Matter of O'Connor*, 153 F.3d 258, 260 (5th Cir. 1998); Bankruptcy Rule 3001(f), and this Court uses the aggregate amount of these presumptively valid claims for purposes of the analysis under § 547(b)(5).

[17] $560,000 (total debts allegedly owed to Seiffert and PLD ) + $3,033,476.00 (other remaining creditors' unsecured claims) = $ 3,593,476.00

[18] If Classic had never assigned the TIRZ receivables to Seiffert and PLD, the total amount of Classic's assets would have been $1,320,000.00.  This figure represents the sum of $560,000.00 (the total of the amounts transferred to Seiffert and PLD) + $760,000.00 (the value of the TIRZ receivables as set forth in Classic's schedules, which were

35

Given these hypothetical figures, the debt owed to Seiffert represents 13.2% of the aggregate debt.[19] Similarly, the debt owed to PLD represents 2.4%.[20] Given these percentages, if distributions were made to Seiffert and PLD under the hypothetical scenario whereby the transfers were never made—thus making the value of Classic's assets equal to $1,320,000.00— Seiffert would receive $174,240.00,[21] and PLD would receive $31,680.00.[22] Both of these amounts are much less than what Seiffert and PLD actually received as a result of Classic having made the transfers (i.e. $475,000.00 to Seiffert and $85,000 to PLD). Stated differently, Seiffert and PLD received amounts greater than they would have received under a hypothetical Chapter 7 case if the $475,000 and $85,000 assignments had not been made. Thus, the Trustee has established the fifth element under § 547(b).

Accordingly, the Court concludes that Classic's assignment of the $475,000 TIRZ receivable to Seiffert and its assignment of the $85,000 TIRZ receivable to PLD are preferential transfers. Pursuant to § 550(a), the Trustee may recover, for the benefit of Classic's estate, the $475,000 TIRZ receivable and the $85,000 TIRZ receivable.

---

signed by Seiffert on April 7, 2007 under penalty of perjury). [FOF 40]. The Court is skeptical of the $760,000.00 value which Seiffert gave to the TIRZ receivables on Classic's Schedule B. However, for purposes of this § 547(b)(5) analysis, the Court accepts this figure as true.

[19] The percentage of unsecured debt held by Seiffert compared to total unsecured debt is 13.2%, which percentage is calculated as follows: $475,000 / $3,593,476.00 = 13.2%.

[20] The percentage of unsecured debt held by PLD compared to total unsecured debt is 2.4%, which percentage is calculated as follows: $85,000/$3,593,476.00 = 2.4%.

[21] Seiffert's distribution under the hypothetical scenario would be calculated as follows: 13.2% x $1,320,000 = $174,240.00.

[22] PLD's distribution under the hypothetical scenario would be calculated as follows: 2.4% x $1,320,000 = $31,680.00.

**C.    Overall conclusion regarding the Trustee's cause of action under TUFTA: The transfers were fraudulent; therefore, the Trustee is entitled to recover the value of the transferred TIRZ receivables.**

The Trustee also asserts a cause of action under the Texas Uniform Fraudulent Transfer Act (TUFTA).  TEX. BUS. & COM. CODE ANN. § 24.001–24.013 (Vernon 2006).  Under TUFTA, the Trustee can prevail in two separate and distinct ways.  First, the Trustee could show that Classic assigned the TIRZ receivables with actual intent to hinder, delay, or defraud any creditor of Classic.  TEX. BUS. & COM. CODE ANN. § 24.005(a)(1) (Vernon 2006).  Second, the Trustee can establish that: (1) Classic assigned the TIRZ receivables without receiving a reasonably equivalent value in exchange for the assignments; **and** (2) Classic was engaged, or was about to engage, in a business or a transaction for which the remaining assets (after the assignments) were unreasonably small in relation to Classic's business or the assignments; **or** Classic intended to incur, or believed, or reasonably should have believed, that it would incur debts beyond its ability to pay as they became due.  TEX. BUS. & COM. CODE ANN. § 24.005(a)(2) (Vernon 2006).[23]

**1.    The Trustee has shown that the assignments of the TIRZ receivables in 2006 were undertaken with actual intent to hinder or defraud Classic's creditors; therefore, the Trustee may recover the TIRZ receivables from the Defendants under a § 24.005(a)(1) cause of action.**

To establish a § 24.005(a)(1) cause of action, the plaintiff must establish that the debtor had "actual intent to hinder, delay or defraud any creditor of the debtor."  TEX. BUS. & COM. CODE ANN. § 24.005(a)(1) (Vernon 2006).  Because the Debtor here is Classic, a partnership in

---

[23] TUFTA also requires a showing that the plaintiff's claim—here, the Trustee's claim—occurred within a reasonable time after the assignments of the TIRZ receivables.  Classic's bankruptcy petition was filed on February 6, 2007—less than one year after the assignments took place.  [FOF 37].  The Court concludes that the Trustee's claim arose within a reasonable time after the assignments took place.  Although the definition of "reasonable time" under TUFTA is not specifically defined, the four year statute of limitations suggests that a "reasonable time" is within four years.  *See Williams v. Performance Diesel, Inc.*, 2002 WL 596414, at *4 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

which Seiffert was a limited partner and also the president [FOF 6], this Court examines Seiffert's intent as representative of Classic's intent.  Indeed, Seiffert was a manager and had complete control of Classic's general partner—Classic Holdings—and he had authority to act on behalf of Classic Holdings [FOF 22], and in fact did act to ensure that the TIRZ receivables were transferred to his daughters, PLD, and himself.  [FOF 26–30].  Thus, this Court should focus on Seiffert's intent with respect to these transfers and their effect on Classic's creditors.  *See Metal Bldg. Components v. Raley, LP*, No. 03-05-00823, 2007 WL 74316, at *12 (Tex. App.—Austin Jan. 10, 2007, no pet.) (holding that an officer of an entity is responsible for fraudulent transfers undertaken by that entity).

Even though direct proof of Seiffert's intent to hinder or defraud may be unavailable, this Court may examine circumstantial evidence to determine whether fraudulent intent was present.  *Roland v. United States*, 838 F.2d 1400, 1402–03 (5th Cir. 1988) (citing *United States v. Chapman*, 756 F.2d 1237, 1242 (5th Cir. 1985)); *Pavy v. Chastant (Matter of Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989).  Section 24.005(b) provides several relevant factors constituting circumstantial evidence—so-called badges of fraud—to consider in determining whether "actual intent" is present for the purposes of § 24.005(a)(1).  TEX. BUS. & COM. CODE ANN. § 24.005(b) (Vernon 2006).  In determining whether Classic, through Seiffert as its president, intended to defraud Classic's creditors—including Cage and Northrup—this Court may consider these specific badges of fraud, which are non-exclusive.  TEX. BUS. & COM. CODE ANN. § 24.005(b)(1–11) (Vernon 2006); *Mladenka*, 130 S.W.3d at 405.

### a.    A review of eleven badges of fraud shows that Seiffert—and therefore Classic—had actual intent to hinder and defraud Classic's creditors.

There are eleven badges of fraud in TUFTA: (1) The transfer or obligation was to an insider; (2) The debtor retained possession or control of the property transferred after the

transfer; (3) The transfer or obligation was concealed; (4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) The transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. TEX. BUS. & COM. CODE ANN. § 24.005(b).

Application of these factors to the suit at bar leads this Court to conclude that the Trustee has established Seiffert's intent to hinder and defraud Classic's creditors.

###    i.        The transfers were made to insiders.

Section 24.002(7) defines the term "insider," when referring to a partnership, to include "a general partner in the debtor," "a person in control of the debtor," or "a relative of a general partner in, a general partner of, or a person in control of the debtor." TEX. BUS. & COM. CODE ANN. § 24.002(7)(C)(i), (ii), and (v).

At trial, testimony showed that Seiffert was not only an officer of Classic, but also exerted control over Classic. [FOF 6]. Melanie's testimony revealed that although she was an officer for Classic Holdings—the general partner of Classic—Seiffert, who was a manager of Classic Holdings, actually wielded the power that accompanied her office. [FOF 22].   Thus, Seiffert was in control of both Classic and Classic Holdings. Under these conditions, this Court concludes that Seiffert is an insider of Classic under § 24.002(7)(C)(v). Because Classic

assigned a $475,000 TIRZ receivable to Seiffert, this Court also concludes that this transfer was to an insider of Classic.

Furthermore, Melanie, Melinda, and Michelle are all insiders because they are direct relatives of an insider. TEX. BUS. & COM. CODE ANN. § 24.002(7)(C)(ii). Because Seiffert was in control of Classic and Classic Holdings [FOF 6 and 22], and because Melanie, Melinda and Michelle are all Seiffert's daughters [FOF 9], this Court concludes that Melanie, Melinda and Michelle are insiders. Moreover, a second independent reason why Melanie, Melinda, and Michelle are insiders arises from their relationships to Classic and Classic Holdings. Melanie is a limited partner of Classic and the president of Classic Holdings. [FOF 10 and 21]. Because she had authority to act for the general partner (i.e. Classic Holdings) concerning the limited partner (i.e. Classic), she is an insider of Classic. Melinda and Michelle were limited partners of Classic whose sister was the president of the general partner. [FOF 19]. Accordingly, Melinda and Michelle are insiders of Classic. Because Classic assigned a $300,000 TIRZ receivable to each of Melinda, Melanie, and Michelle, [FOF 26–28], this Court concludes that these transfers were to insiders.

PLD is an entity owned by Seiffert ($585,000, or 65%), Melanie ($117,000, or 13%), Melinda ($63,000, or 7%), Michelle ($63,000, or 7%), and Partners Land Development GP ($72,000, or 8%), which is the general partner of PLD. [FOF 2]. Because PLD is owned and controlled by individuals whom this Court has already held to be insiders of Classic, it follows that PLD is an insider of Classic. Accordingly, because Classic assigned an $85,000 TIRZ receivable to PLD [FOF 30], this Court concludes that this transfer was to an insider of Classic. Thus, the first badge of fraud is present.

### ii.   The debtor retained possession or control of the property transferred after the transfer.

Once Classic assigned the TIRZ receivables to Seiffert, Melanie, Michelle, Melinda, and PLD, Classic lost control of the TIRZ receivables.   The assignments are absolute, not conditional. [FOF 33].  Thus, this badge of fraud is not present in the suit at bar.

### iii.   The transfers were concealed. [24]

Testimony at trial revealed that Seiffert notified neither Cage nor Northrup about the assignments of the TIRZ receivables.   [FOF 34].   Prior to the transfers, Seiffert knew that Mendel and Marek had filed Chapter 7 petitions; and he also knew that trustees had been appointed to administer each of their Chapter 7 estates:  Cage for Mendel's estate and Northrup for Marek's estate. [FOF 20].  Seiffert therefore knew that Cage and Northrup stood in the shoes of Mendel and Marek, respectively, and that they became owners of the limited partnership interests in Classic that Mendel and Marek owned on the filing dates of their respective bankruptcy petitions.   Yet, Seiffert deliberately did not notify Cage and Northrup of the following:  (1) the formation of Classic's new general partner (Classic Holdings); and (2) the assignment by Classic—at the direction of the new general partner known as Classic Holdings— of the TIRZ receivables to all holders of limited partnership interests in Classic, except Cage and Northrup, who each had greater limited partnership interests than Seiffert, Melanie, Melinda, Michelle, and PLD.  Thus, Seiffert, using the new general partner which he controlled, had this general partner (on behalf of Classic) execute assignments of the TIRZ receivables to himself, his daughters, and an entity (PLD) which his daughters and he owned—and he did so while

---

[24] Although there were eight transfers of TIRZ receivables overall, Mason, Mendel, and Fitch have already settled out of the suit at bar.  [FOF 42-45].  Therefore, this Court is focused on the transfers made to the remaining defendants in this suit:  Seiffert, Melanie, Michelle, Melinda, and PLD.

keeping Cage and Northrup in the dark.[25]  Seiffert thus surreptitiously drained all of Classic's major unencumbered assets for the benefit of his family, and he did so knowingly at the expense of the Chapter 7 estates of Mendel and Marek.  Under these circumstances, this Court concludes that Seiffert concealed the transfers.  This concealment establishes the third badge of fraud.

In making this conclusion, it is important to remember that Marek was the sole member of Classic's original general partner (Classic GP).  Hence, the following occurred once Northrup became the Chapter 7 Trustee for Marek's estate: (1) she took over any interest or powers that Marek had by virtue of his being the sole member of Classic GP; and (2) she took title to Marek's limited partnership interest in Classic.  Because Northrup stood in Marek's shoes as the sole member of Classic GP, and because she became an owner of a limited partnership interest in Classic, Seiffert should have given notice to her that Classic GP was being replaced as general partner by Classic Holdings and that Classic Holdings, as the new general partner, was executing assignments transferring Classic's property (i.e. the TIRZ receivables) to certain limited partners. *In re Leal*, 360 B.R. 231, 235 (Bankr. S.D. Tex 2007) ("Partners owe to the partnership and to each other fiduciary duties as a matter of law, including a duty of loyalty and care") (citing *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998)).  At trial, Defendants suggested that restrictions on transfers of partnership interests set forth in the Agreement would prevent Northrup from assuming Marek's partnership interest.  The Court disagrees.  This construction would fly in the face of § 541(c)(1)(A) and case law.  Section 541(c)(1)(A) "invalidates restrictions on the transfer of property of the debtor, in order that all of the interests of the debtor will become property of the estate." *Samson v. Prokopf (In re Smith)*, 185 B.R. 285, 291–92 (Bankr. S.D. Ill. 1995).

---

[25] The only notice that Seiffert gave about the assignments was to the TIRZ board.  He gave this entity notice only because he had to in order to make the assignments effective. [FOF 20].

### iv.    Before the transfers were made, the debtor had been sued or threatened with suit.

Although Classic had previously initiated other litigation, no other suit was threatened or filed against Classic before Classic transferred the TIRZ receivables. [FOF 51]. Accordingly, this badge of fraud is not present in the suit at bar.

### v.    The transfers were substantially all of the debtor's assets.

Classic transferred substantially all of its assets to Seiffert, Melanie, Michelle, Melinda, PLD, Fitch, Mason, and Gene (the Transferees). [FOF 25–33]. Exhibits revealed that Classic's only material assets were real estate (with no equity) and the TIRZ receivables.[26] [FOF 48]. After the real estate assets were foreclosed upon, Classic was then left with the TIRZ receivables as its major assets, and these receivables were unencumbered. [FOF 48 and 49]. Subsequently, Seiffert transferred all of the TIRZ receivables, leaving Classic with no material assets. Thus, this Court finds that the fifth badge of fraud is present.

### vi.    The debtor absconded.

Black's Law Dictionary defines the word "abscond" as "to depart secretly or suddenly, [especially] to avoid arrest, prosecution, or *service of process*." BLACK'S LAW DICTIONARY 7 (8th ed. 2004) (emphasis added).

Melanie, who was both the president and a manager of Classic's general partner and a limited partner of Classic, absconded because she avoided service of process. Melanie testified

---

[26] This Court is highly skeptical of any Classic financial statement compiled by Seiffert or persons controlled, or paid by, Seiffert. Accordingly, the 2/1/2006 balance sheet setting forth that the real estate had a value of $3,596,482.23 is not credible. Rather, this Court places much greater credibility in the value set forth in Cole's appraisal; the figure that he places on the real estate as of 1/31/2006 is $2,978,570. According to Classic's balance sheet, as of 2/1/2006, the total debt owed to First National Bank, the lien holder on the real estate, was $2,888,370.79. Given these figures, and given costs of sale, including standard broker's fees, Classic did not have any equity in the real estate.

that she did not come to the door when the process server attempted to serve her. [FOF 11].[27]

Indeed, when the process server came to her door, Melanie refused to answer. [FOF 11].

However, when asked by counsel for the Defendants to appear in this Court to testify, she came

willingly. [FOF 11]. Because she is both president and manager of Classic Holdings—the

general partner of Classic—she is considered to act on behalf of Classic. Accordingly, this Court

concludes that because Melanie avoided service of process, Classic absconded. Thus, the sixth

badge of fraud is satisfied in the suit at bar.

### vii.    The debtor removed or concealed assets.

In their tax returns, Seiffert and his daughters all failed to disclose the assignments of

their partnership interests in Classic in exchange for the TIRZ receivables. [FOF 35]. Seiffert,

Melanie, Michelle, and Melinda all failed to disclose their receipt of the TIRZ receivables, and

therefore concealed these assets. Moreover, Seiffert, acting on behalf of Classic, concealed from

Cage and Northrup the transfers of the TIRZ assignments to his daughters, PLD, and himself.

[FOF 34]. Thus, the seventh badge of fraud is present.

### viii.    The value of the consideration received by Classic was not reasonably equivalent to the value of the TIRZ receivables that Classic transferred to Seiffert, Melanie, Michelle, Melinda, and PLD.

This Court assesses the value that Classic received in light of the statute's purpose "to

protect the creditors." *S.E.C. v. Resource Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007)

(citing *In re Agric. Res. & Tech. Group, Inc.*, 916 F.2d 528, 540 (9th Cir. 1990)). No credible

documentation exists describing the work which Seiffert allegedly performed to justify back

salary of $225,000. [FOF 53]. The absence of such documentation leads this Court to conclude

---

[27] The Court finds that Melanie was not credible when testifying about the reasons that she refused to come to the front door to accept service of process.

that Classic owed him no back salary.  There is also no credible documentation evidencing a $250,000 loan that Seiffert asserts that he made to Classic.  [FOF 53].  The absence of such documentation also leads this Court to conclude that Classic owed no such obligation to Seiffert. Finally, because no credible documentation exists to describe rental agreements between Classic and PLD [FOF 30], this Court concludes that Classic owed no rent, past due or otherwise, to PLD.  Because Classic owed none of these obligations to Seiffert and PLD, the Court concludes that: (a) Classic received insufficient consideration from Seiffert for Classic's assignment to him of the $475,000 TIRZ receivable; and (b) Classic received insufficient consideration from PLD for Classic's assignment to it of the $85,000 TIRZ receivable.

The analysis for Seiffert's three daughters is different because they have never asserted that Classic owed them any debts.  Rather, they contend that the consideration they gave was their partnership interests in Classic.  [FOF 26–28].  This argument also fails.  Cole's expert testimony and his written report, as well as Classic's own internal financial statements—however suspect they may be—demonstrate that Classic was insolvent for several months, if not years, prior to the transfers of the TIRZ receivables to Seiffert's daughters.  [FOF 36].  Thus, their partnership interests had no value, which means they gave absolutely no consideration to Classic in exchange for a $300,000.00 TIRZ receivable.  The Court concludes that Classic did not receive reasonably equivalent value in return for transferring the TIRZ receivables to Seiffert's daughters.[28]  Thus, the eighth badge of fraud is present.

---

[28] To the extent that Seiffert asserts that part of the consideration that he gave to Classic was his partnership interest, this argument fails for the same reason that the arguments of his three daughters fail; their partnership interests had no value due to Classic's insolvency.

### ix.    The debtor was insolvent or became insolvent shortly after the transfers were made.

A debtor is insolvent when "the sum of a debtor's debts is greater than all of the debtor's assets at a fair valuation." TEX. BUS. & COM. CODE ANN. § 24.003 (Vernon 2006). Classic was insolvent before and as of February 21, 2006, the date that Classic first assigned the TIRZ receivables. [FOF 15]. On June 28, 2006, when Classic made its final assignment of the TIRZ receivables, Classic was still insolvent. [FOF 15]. Indeed, the Trustee's expert, Cole, testified that Classic was insolvent during all of Classic's assignments of the TIRZ receivables.[29] [FOF 15]. Specifically, Cole testified that he concluded that Classic was insolvent as of April 30, 2005 and at all times thereafter. [FOF 15]. This calculation was not only based on the "balance sheet test," but also on certain discounting methods. [FOF 15]. Because Cole not only adhered to the "balance sheet test," but went above and beyond the balance sheet test to value Classic's assets and liabilities, this Court concludes that Cole and his methods are highly credible and that Classic was insolvent at the time of all of the TIRZ's assignments. Given Cole's testimony, and Classic's own balance sheets which show that Classic's liabilities exceeded its assets at all relevant times, [FOF 15], this Court concludes that Classic was insolvent on all of the dates that Classic assigned the TIRZ receivables to Seiffert, his daughters, and PLD.

The Trustee has satisfied his burden of proof that Classic was insolvent on or about the dates that Classic made the assignments to Seiffert, Melanie, Michelle, Melinda, and PLD. Thus, the ninth badge of fraud is present.

---

[29] Specifically, the assignment to Michelle was made on February 21, 2006 [FOF 26]; the assignments to Melanie and Melinda were made on February 22, 2006 [FOF 27-28]; the assignment to Seiffert was made on February 28, 2006 [FOF 29]; and the assignment to PLD was made on June 28, 2006. [FOF 30].

**x.    The transfers occurred shortly before or shortly after a substantial debt was incurred.**

Classic incurred a debt of $53,869.95 to the law firm of Chamberlain, Hdrlicka, White, Williams & Martin between September 7, 2006 and November 15, 2006. [FOF 51]. A debt this large is substantial. *See In re Sissom*, 366 B.R. 677, 698 (Bankr. S.D. Tex. 2007) (finding a debt of $50,000 to be "substantial"). The final transfers occurred on June 28, 2006. [FOF 30–31]. Thus, less than 90 days passed between the final transfers and the date on which the substantial debt to the law firm was first incurred. Although there is no specific length of time which limits "shortly before or shortly after," the Court believes that the Code's use of 90 days for preferential transfers, and up to one year for insiders, is a reasonable analogy. *See* 11 U.S.C. § 547. Because Classic incurred this substantial debt less than three months after the last TIRZ receivable was transferred, the tenth badge of fraud is present.

**xi.    The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.**

Although the transfer here was not to a lienor, Seiffert used Classic's new general partner (i.e. Classic Holdings) as the middleman necessary to effectuate the assignments. By creating Classic Holdings, and ensuring that it became the general partner of Classic, Seiffert made sure that Classic GP would no longer be Classic's general partner. [FOF 20]. Marek was the sole member of Classic GP, and Northrup, as Trustee of Marek's Chapter 7 estate, assumed Marek's powers as sole member of Classic GP. [FOF 17]. Thus, Seiffert's actions guaranteed that Northrup could not prevent Classic from assigning the TIRZ receivables to Seiffert, his daughters, and PLD. [FOF 20]. Seiffert, as Classic Holdings' manager, used the general partner powers of Classic Holdings to have Classic assign the TIRZ receivables to the Seiffert family members. [FOF 26–30]. During the time period that Seiffert established Classic Holdings and

47

effectuated Classic's assignment of the TIRZ receivables, Seiffert gave no notice to Cage or Northrup, who each held limited partnership interests in Classic like all of the Seifferts and PLD. [FOF 19]. Indeed, Cage and Northrup each held a percentage interest in Classic which was greater than the 15% interests held by the three daughters and the 5% interest held by Seiffert himself. [FOF 7, 10, 16, and 17].

Seiffert does not deny that he failed to give notice to Cage and Northrup of the creation of Classic Holdings and of the assignment of the TIRZ receivables. When asked why he failed to give them notice, Seiffert initially testified that "[m]y attorneys told me that they didn't have to notify the trustees."[30] [FOF 37]. After counsel for the Trustee again asked Seiffert why he did not notify Cage and Northrup, Seiffert responded with a long pause and lamely replied: "I don't know." [FOF 37].

The Court finds that Seiffert deliberately did not give notice to Cage and Northrup because he wanted his three daughters, the family-owned PLD, and himself to reap the benefits of the TIRZ receivables and preclude the Chapter 7 estates of Mendel and Marek from receiving the same benefits. To accomplish his improper objective, Seiffert used the newly-created Classic Holdings just like other transferors have used a lienor to transfer assets to an insider. As such, the eleventh badge of fraud is satisfied.

---

[30] Seiffert's answer suggests that his attorneys told him that they (meaning the attorneys) did not have to notify either Cage or Northrup. What duties the attorneys had to notify Cage and Northrup is irrelevant. Moreover, even if Seiffert's statement is interpreted to mean that his attorneys informed him that he did not have to notify Cage and Northrup, this would be an insufficient explanation, as it would be unreasonable reliance. When defending against a cause of action based on fraudulent intent, a debtor is precluded from asserting the defense of reliance on his attorney when that reliance is neither reasonable nor in good faith. *Gebhardt v. Gartner* (*In re Gartner*), 326 B.R. 357, 374 (citing *Morton v. Dreyer* (*In re Dreyer*), 127 B.R. 587, 597 (Bankr. N.D. Tex. 1991)); *see also FDIC v. Sullivan* (*In re Sullivan*), 204 B.R. 919, 943 (Bankr. N.D. Tex. 1997). It is neither reasonable nor in good faith for a sophisticated businessman such as Seiffert to rely on an attorney's advice to treat limited partners in the same partnership differently, particularly by excluding two partners from a distribution of all material assets.

    **b.**    **In addition to the badges of fraud expressly set forth in TUFTA, this Court may consider these following additional badges of fraud:**

        (1) The transfers were done just prior to the filing of the Debtor's bankruptcy petition. *Sissom*, 366 B.R. at 692–693 (citing *In re Lacounte*, 342 B.R. 809, 816 (Bankr. D. Mont. 2005)).

        (2) The Debtor is unable to explain the disappearance of assets. *Sissom*, 366 B.R. at 693 (citing *Lacounte*, 342 B.R. at 815).

        (3) The Debtor has engaged in a pattern of "sharp dealing" prior to bankruptcy. *Sissom*, 366 B.R. at 693 (citing *In re Agnew*, 355 B.R. 276, 285 (Bankr. D. Kan. 2006)).

        **i.**    **The transfers were done just prior to the filing of the Debtor's bankruptcy petition.**

Classic transferred the last TIRZ receivables eight months prior to the filing of Classic's involuntary bankruptcy petition. [FOF 30–31]. Typically, a transfer is "just prior to the filing" if it is less than three months before the bankruptcy petition is filed. *Lacounte*, 342 B.R.at 812–816. As previously noted, the Court believes that the lookback period found in 11 U.S.C. § 547 is an appropriate analogy. The lookback period for insiders under § 547(b) is one year. Each of the Defendants are insiders of Classic who took actions beneficial solely to themselves and harmful to Classic's creditors. Thus, the Court finds that any transfers made less than one year before the filing of Classic's involuntary petition constitute transfers which "were done just prior to the filing of the bankruptcy petition." *See Hirsch v. Tarricone, Inc. (In re Tarricone, Inc.)*, 286 B.R. 256, 260–261 (Bankr. S.D.N.Y. 2002) (citing *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1195 (7th Cir. 1989)). Accordingly, this badge of fraud is present in the suit at bar.

ii.      **The Debtor is unable to explain the disappearance of assets.**

This badge of fraud is not present in the suit at bar.

iii.      **The Debtor engaged in a pattern of "sharp dealing" prior to bankruptcy.**

The Court focuses on whether Classic, through Seiffert as its president, has engaged in sharp dealing prior to bankruptcy. "Black's Law Dictionary does not specifically define 'sharp dealing,' but it defines 'sharp practice' as '[u]nethical action and trickery, esp. by a lawyer,' and further notes that the term has the archaic meaning of unhandsome dealing. Webster's Dictionary defines 'sharp practice' as 'the act of dealing in which the advantage is taken or sought unscrupulously.'" *Sissom*, 366 B.R. at 700 n. 34 (citations omitted). The record reflects a pervasive lack of ethics, as well as substantial trickery, throughout the course of Seiffert's dealings.

The manner in which Classic transferred the TIRZ receivables to various insiders is a form of sharp dealing. Classic transferred its sole unencumbered assets, $2,210,000 in TIRZ receivables, to certain select insiders—i.e. Seiffert, Melanie, Michelle, Melinda, PLD, Fitch, Gene, and Mason.[31] [FOF 25–33]. The transfers were all effectuated when Classic was woefully insolvent and owed obligations to several non-insider creditors in the aggregate amount of $5,560,492.[32] [FOF 36, 15].

---

[31] Because Mendel and Mason were limited partners of Classic, they are insiders. Because Gene is a relative of Mendel, he is an insider. Because Fitch served as counsel for Classic, he is also an insider. *Schilling v. Heavrin (In re Triple S Restaurants, Inc.)*, 422 F.3d 405, 414 (6th Cir. 2005).

[32] Using Cole's indebtedness figure, Classic was insolvent to the tune of -$2,451,920 as of January 30, 2006 (i.e. three weeks before Classic made the first transfer of a TIRZ receivable). However, if the numbers in Classic's internal balance sheet are to be believed—and this Court doubts that they should be—the aggregate amount of indebtedness as of February 1, 2006 was $3,859,243.53. Using this figure, Classic was still insolvent to the tune of -$251,755.13, a scenario which still casts a pall over the transfers of the TIRZ receivables.

To make these transfers, Seiffert created a new general partner, Classic Holdings, and he completed all of the transfers without notifying Cage or Northrup. [FOF 20]. Indeed, Seiffert replaced Classic's general partner without notifying Cage or Northrup because he knew he would not be able to assign the TIRZ receivables while Marek's Trustee was the sole member of Classic's general partner.[33] [FOF 20]. The creation of this new general partner is another example of Seiffert's sharp dealing.

It is also worth noting that Seiffert made his daughter Melanie the president of Classic Holdings in order to create the impression that she, not he, was in charge of this entity.[34] [FOF 23]. However, there is no question that it was Seiffert who was actually in charge of Classic Holdings, not Melanie. [FOF 22]. All of his daughters did exactly as he told them to do. The false picture that Seiffert and his daughters attempted to portray—namely, that they were all dealing with one another at arm's length, and that they each followed their own individual business judgment in making decisions—is yet another form of sharp dealing.

Finally, Seiffert, who controlled Classic's books, failed to document the alleged back salary of $225,000 owed to him by Classic and the alleged $250,000 loan which he made to Classic. [FOF 29]. Seiffert testified that the $475,000 transfer of the TIRZ receivable to him satisfied these two obligations. [FOF 29]. Just as he attempted to create the illusion that Melanie was in charge of Classic Holdings, so did he attempt to concoct a story about having

---

[33] It should be noted that Marek's Chapter 7 Trustee, Northrup, could not, as a matter of law, serve as general partner of Classic. TEX. REV. CIV. STAT. ANN. art. 6132a-1, § 4.02(a)(4)(B) (Vernon Supp. 2008). However, Marek himself was not the general partner of Classic. Rather, Marek was the sole member of Classic GP, and it was this latter entity that was Classic's general partner. Classic GP did not file a bankruptcy petition. Therefore, when Marek filed his Chapter 7 petition, Northrup received all rights that Marek had as the sole member of Classic GP. By creating Classic Holdings, Seiffert ensured that Northrup would be unable to thwart Seiffert's plans to have Classic assign the TIRZ receivables to his daughters, PLD, and himself.

[34] As this Court discussed in the section on credibility of witnesses, at trial, Seiffert initially attempted to portray Melanie as the person whose approval was needed for actions to be taken on behalf of Classic Holdings.

made a loan to Classic and having unpaid salary owed to him. This is a fourth example of sharp dealing. Based upon Seiffert's actions described above, the fourteenth badge of fraud is present.

     **c.**    **In conclusion, eleven of the fourteen badges of fraud are present in this suit.**

By focusing on Seiffert, as a limited partner and the president of Classic as well as a member of Classic Holdings, the Trustee has demonstrated that there are eleven badges of fraud present in the suit at bar. By establishing eleven of the fourteen badges of fraud, the Trustee has met the burden of proof in showing that Classic transferred the TIRZ receivables with the actual intent to hinder or defraud Classic's creditors. *See Havis v. AIG Sunamerica Life Assurance Co. (In re Bossart)*, No. 06-3540, 2007 WL 4561300, at *16 (Bankr. S.D. Tex. Dec. 21, 2007) (holding that eight badges of fraud was sufficient to find fraudulent intent).[35]

     **2.**    **In the alternative, even if this Court is incorrect in concluding that the Trustee has shown that the assignments of the TIRZ receivables were undertaken with actual intent to hinder or defraud Classic's creditors pursuant to § 24.005(a)(1), the Trustee has nevertheless satisfied both elements of § 24.005(a)(2).**

The second way for the Trustee to prevail is to show under § 24.005(a)(2) that: (1) Classic assigned the TIRZ receivables without receiving a reasonably equivalent value in exchange for the assignments; **and** (2) Classic was engaged, or was about to engage, in a business or a transaction for which the remaining assets (after the assignments) were unreasonably small in relation to Classic's business or the assignments; **or** Classic intended to incur, or believed, or reasonably should have believed, that it would incur debts beyond its ability to pay as they became due. TEX. BUS. & COM. CODE ANN. § 24.005(a)(2).

---

[35] "There is no magic number of badges that conclusively establishes fraudulent intent; but a concurrence of several badges of fraud in the same case makes a strong argument for fraud." *Bossart*, 2007 WL 4561300 at *16 (citing *Roland*, 838 F.2d at 1403; and, *Walker*, 232 S.W.3d at 914).

a.   **The first element of § 24.005(a)(2):  Classic did not receive reasonably equivalent value in exchange for the TIRZ receivables.**

To satisfy the first element of § 24.005(a)(2), the Trustee must show that Classic did not receive reasonably equivalent value in exchange for the transfer of the TIRZ receivables. TEX. BUS. & COM. CODE ANN. § 24.005(a)(2) (Vernon 2006).  This Court has already concluded that Classic did not receive reasonably equivalent value for the transfer of the TIRZ receivables in "Conclusions of Law Section (IV)(C)(1)(a)(viii)."  Accordingly, the first element is satisfied.

b.   **The second element of § 24.005(a)(2):  (1) Classic was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or (2) Classic intended to incur, or believed, or reasonably should have believed, that it would incur debts beyond its ability to pay as they became due.**

i.   **Classic was engaged, or was about to engage, in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.**

To determine whether a debtor's assets were unreasonably small, the Court must "examine the ability of the debtor to generate enough cash from operations and sales of its assets to pay its debts and remain financially stable." *In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992) (quoting *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 999 (Bankr. S.D. Ohio 1990)).  Because Classic was left with no material unencumbered assets after the transfers of the TIRZ receivables [FOF 49], the Court concludes that Classic would not have subsequently been able to generate enough cash to pay its debts and remain financially stable.  As such, Classic's assets were unreasonably small in relation to the transfers of the TIRZ receivables in 2006.

ii.     **In the alternative, Classic reasonably should have believed that it would incur debts beyond its ability to pay them as they became due.**

TUFTA defines insolvency as when "the sum of a debtor's debts is greater than all of the debtor's assets at a fair valuation." TEX. BUS. & COM. CODE ANN. § 24.003 (Vernon 2006). As discussed above in "Conclusions of Law (C)(1)(a)(ix)," Classic was insolvent at the time the assignments were made. [FOF 25–31]. Because the Trustee has shown that Classic was insolvent at the time of the transfers, and Classic's books show that it was insolvent [FOF 15, 50], Classic should have reasonably believed that it could not pay its debts as they became due.

The Trustee has shown that: (1) Classic was engaged, or was about to engage, in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; and (2) Classic reasonably should have believed that it could not pay its debts as they became due. Thus, the Trustee has satisfied the elements of § 24.005(a)(2).

3.     **Under TUFTA, this Court is permitted to issue judgment against all of the Defendants as first transferees of the assets.**

Under TUFTA, a court may issue judgment against either the first transferees of the property or subsequent transferees not acting in good faith. TEX. BUS. & COM. CODE ANN. §§ 24.009(b) (Vernon 2006). The Trustee has adduced sufficient evidence to show that Seiffert, Melanie, Michelle, Melinda, and PLD are the first transferees of the TIRZ receivables. Indeed, there are not any subsequent transferees. Seiffert and his daughters testified that all of them still own title to the TIRZ receivables that Classic assigned to them. [FOF 33].

54

4.      **The Defendants are liable to the Trustee for: (a) the difference between the aggregate total value of TIRZ receivables transferred, less the total value previously settled for; (b) interest; and (c) reasonable attorney's fees incurred by the Trustee.**

a.      **§§ 24.009(c)(1) and 24.008(a)(3)(C) permit this Court to order the Defendants to pay the Trustee the difference between the aggregate total value of TIRZ receivables transferred and the total value previously settled for.**

This Court must award judgment "for an amount equal to the value of the assets at the time of the transfer, subject to adjustment as the equities may require." TEX. BUS. & COM. CODE ANN. § 24.009(c)(1) (Vernon 2006). Additionally, this Court may order "any other relief the circumstances may require." TEX. BUS. & COM. CODE ANN. § 24.008(a)(3)(C) (Vernon 2006). In the suit at bar, Seiffert, a man with previous convictions of bank fraud and tax fraud [FOF 6], acted with the intent to defraud Classic's creditors. His daughters benefited from these fraudulent transfers by doing whatever their father told them and signing any documents that he put in front of them [FOF 22] with full knowledge that their father had previously been convicted of white-collar felonies. [FOF 6]. That their father executed the assignments in his capacity as manager of Classic's general partner—Classic Holdings—does not protect Seiffert's daughters from being held equally liable for making Classic's Chapter 7 estate whole again.

This Court will not allow the daughters to claim either lack of involvement or ignorance as an excuse to wrongfully keep money that their father schemed to get into their possession. Because (a) the daughters knowingly allowed their father to act for their substantial benefit; (b) Melanie was president and a manager of Classic Holdings; (c) all three of them signed all of the documents that their father put in front of them; and (d) all three daughters were limited partners in Classic (and thus had no greater distribution rights than Cage and Northrup), this Court holds the daughters liable for their father's actions. This Court concludes that Seiffert, Melanie,

Michelle, Melinda, and PLD are all jointly and severally liable for the difference remaining between the value of TIRZ receivables assigned from Classic and the amount previously settled for by former defendants no longer parties in this suit.[36]

The total value of TIRZ receivables transferred was $2,210,000.  [FOF 33].  Because Fitch, Marek, and Gene have previously settled for a total amount of $375,000, the Trustee still needs $1,835,000, plus interest, from Seiffert, Melanie, Michelle, Melinda, and PLD, in order to be made whole again.[37]  [FOF 52].  The figure of $1,835,000 represents the sum of the TIRZ receivables transferred to Seiffert ($475,000), Melanie ($300,000), Michelle ($300,000), Melinda ($300,000), and PLD ($85,000), plus the Fitch Deficiency ($25,000), the Gene Deficiency ($200,000), and the Mason Deficiency ($150,000).  [FOF 43–45].[38]

### b.  The Defendants must pay interest on the $1,835,000.00.

Interest on the sum of $1,835,000 is determined by using the federal judgment interest rate, which is 2.35% per annum.[39]  28 U.S.C. § 1961(a); *see also NCNB Tex. Nat'l Bank v. A.S.M., Inc. (In re A.S.M., Inc.)*, 110 B.R. 802, 806 (Bankr. W.D. Tex. 1990) (holding that 28

---

[36] It is within this Court's discretionary authority to impose joint and several liability in a suit involving fraudulent transfers. *See 718 Arch St. Assoc., Ltd. v. Blatstein (In re Blatstein)*, 260 B.R. 698, 720–21 (E.D. Pa. 2001).

[37] The suit at bar is similar to *Airflow Houston, Inc.* in that the recipient of fraudulently transferred assets was liable not only for the value of assets it received, but for the entirety of the creditor's claim. *Airflow Houston, Inc. v. Theriot*, 849 S.W.2d 928, 934 (Tex. App.—Houston [1st Dist.] 1993, no writ) (relying upon TEX. BUS. COM. CODE ANN. § 24.008(3)(C)); *see also McDill Columbus Corp. v. Univ. Woods Apartments, Inc.*, No. 06-99-00138-CV, 2001 WL 392061, at *8 (Tex. App.—Texarkana April 19, 2001, pet. denied)).

[38] It is typically the defendant's burden of proof to show a right to credit for settlement. *Metal Building Components*, 2007 WL 74316 at *19 (citing *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 927 (Tex. 1998)). Although Seiffert has not shown the amounts previously settled for, the Trustee has.  As a result, the Trustee's recovery will be reduced by the amounts previously settled for.

[39] "Interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding."  28 U.S.C. § 1961.  The published rate for the week of July 4 is 2.35%. http://www.federalreserve.gov/releases/h15/current/ (last visited July 10, 2008).

U.S.C. § 1961(a) applies to bankruptcy court judgments). The interest is calculated as follows: (Amount of TIRZ receivable) x .0235 x (number of days since the transfer/365 days)  The results from these calculations are shown on Exhibit B attached hereto.  As of the close of business on July 10, 2008, the total amount of interest is $100,283.18.  This figure, plus $1,835,000.00, equals $1,935,283.18.

      **c.**      **Because the suit at bar is a proceeding under TUFTA, this Court may award costs and attorney's fees in favor of the Trustee.**

Section 24.013 allows this Court to award "costs and reasonable attorney's fees as are equitable and just."  TEX. BUS. & COM. CODE ANN. § 24.013 (Vernon 2006); *Walker v. Anderson*, 232 S.W.3d 899, 919 (Tex. App.—Dallas 2007, no pet.).  This Court has concluded that Seiffert, Melanie, Michelle, Melinda, and PLD have defrauded the creditors of Classic's bankruptcy estate by surreptitiously taking assignments of the TIRZ receivables for no consideration.[40]  Given this egregious conduct, this Court concludes that it is equitable and just to award attorney's fees and costs to the Trustee for his prosecution of this adversary proceeding. Accordingly, this Court will hold a separate evidentiary hearing to allow the Trustee to prove up the reasonable fees and expenses that he incurred in prosecuting this lawsuit.  Seiffert, Melanie, Michelle, Melinda, and PLD are jointly and severally liable for these fees and expenses in addition to being jointly and severally liable for the amount of $1,935,283.18, plus post-judgment per diem interest.

---

[40] Because PLD is owned entirely by Seiffert, his daughters, and a general partnership which is controlled by the Seifferts [FOF 2], this Court concludes that PLD has also defrauded the creditors of Classic's estate.

**D.**   **The transfers to Seiffert, Melanie, Michelle, Melinda, and PLD were fraudulent under 11 U.S.C. § 548(a)(1)(A) and (B), and the Trustee is therefore entitled to recover the TIRZ receivables.**

11 U.S.C. § 548(a)(1)(A) and § 548(a)(1)(B) concern transfers that were made prior to the filing of Classic's involuntary bankruptcy petition. These transfers do not necessarily need to be made to creditors to be recoverable. Accordingly, this section of the Memorandum Opinion focuses on not only Seiffert and PLD—who assert that they are creditors of Classic—but also Melanie, Michelle, Melinda, and PLD.

**1.**   **The Trustee prevails under § 548(a)(1)(A).**

11 U.S.C. § 548(a)(1)(A) allows a trustee to avoid a transfer made with "actual intent to hinder, delay, or defraud" the transferor's creditors. The evidence introduced in the present suit satisfies the requirements of § 548(a)(1)(A).

**a.**   **Classic intended to hinder or defraud Classic's creditors when Seiffert, acting as manager of Classic's general partner, had Classic assign the TIRZ receivables to his daughters, PLD, and himself.**

To prevail under § 548(a)(1)(A), the Trustee must show that the Debtor had "actual intent to hinder, delay or defraud any creditor of the debtor." 11 U.S.C. § 548(a)(1)(A). Because Seiffert was a limited partner and also president of Classic [FOF 6, 7, 10, and 24], the Court examines Seiffert's intent as representative of the partnership's intent. Additionally, Seiffert was manager of Classic's general partner—Classic Holdings—and had authority to act on behalf of Classic Holdings. [FOF 22]. Thus, this Court focuses on Seiffert's intent with respect to these transfers and the effect thereof on the creditors of Classic's estate. *See Metal Bldg Components*, 2007 WL 74316 at *12 (holding that the fraudulent intent of a director and officer may be imputed to the corporation).

In assessing intent to defraud under § 548(a)(1)(A), courts look the relevant state's "badges of fraud." *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000); *In re Sissom*, 366 B.R. at 692; *In re Maronde*, 332 B.R. at 600. In the present suit, the Court turns to TUFTA to decide if these badges are present. As previously noted, § 24.005(b) of TUFTA provides several badges of fraud to consider in determining whether "actual intent" is present for the purposes of § 24.005(a)(1). TEX. BUS. & COM. CODE ANN. § 24.005(b) (Vernon 2006). In determining whether Seiffert intended to defraud Classic's creditors, this Court may consider these specific badges of fraud, which are non-exclusive. TEX. BUS. & COM. CODE ANN. § 24.005(b)(1–11) (Vernon 2006); *Mladenka*, 130 S.W.3d at 402. The Court's analysis of each of these badges of fraud in "Conclusions of Law Section IV(C)(1)(a)(i-xi)" is applicable to § 548(a)(1)(A). The Trustee has therefore met the burden of proof in showing that Classic transferred the TIRZ receivables with the actual intent to hinder or defraud Classic's creditors. Accordingly, the assignments of the TIRZ receivables constitute fraudulent transfers under § 548(a)(1)(A).

2. **In the alternative, Classic received "less than reasonably equivalent value" in exchange for the assignments of the TIRZ receivables and these assignments either occurred when Classic was insolvent or they caused Classic to become insolvent.**

11 U.S.C. § 548(a)(1)(B) allows a trustee to avoid a transfer when the debtor receives "less than reasonably equivalent value" in exchange for the transfer and the transfer either occurs when the debtor is insolvent or causes the debtor to become insolvent.

a. **Classic received less than reasonable equivalent value when it transferred the TIRZ reimbursements.**

TUFTA uses the same phrase "reasonably equivalent value" which appears in § 548(a)(1)(B), and as such, the same analysis applies to TUFTA claims and § 548(a)(1)(B) claims. *See Hinsley*, 201 F.3d at 643. In determining "reasonably equivalent value," courts

59

consider whether there is a reasonable and fair proportion between what the debtor transferred and what the debtor received in return. *Am. Founders Fin. Corp.*, 365 B.R. at 666; TEX. BUS. & COM. CODE ANN. § 24.004(d) (Vernon 2006). The Court's analysis set forth in "Conclusions of Law (C)(1)(a)(viii)" applies to § 548(a)(1)(B). Therefore, the Trustee has satisfied this element.

> **b.      Classic was insolvent when it transferred the TIRZ receivables or the transfers caused Classic to become insolvent.**

The analysis set forth in "Conclusions of Law (C)(1)(a)(ix)" applies.   Therefore, the Trustee has satisfied this second element. The Trustee has satisfied both elements of § 548(a)(1)(B). Accordingly, the assignments of the TIRZ receivables were fraudulent transfers.

> **3.      11 U.S.C. § 550(a) allows the Trustee to recover the TIRZ receivables which Classic assigned to the Defendants.**

A trustee may avoid and recover the property or value of the property fraudulently transferred under § 548 from the "initial transferee of such transfer, or the entity for whose benefit the transfer was made." 11 U.S.C. § 550(a).  Seiffert, Melinda, Michelle, Melanie and PLD are all initial transferees of the TIRZ Reimbursements.   [FOF 26–30].   Further, the assignments were made for their benefit because each party gained the right to the future TIRZ reimbursements.   Therefore, pursuant to § 550(a), the Trustee may avoid the assignments and recover the value of the TIRZ reimbursements.

> **E.      Overall conclusion regarding the Trustee's cause of action against Seiffert and Melanie for breach of fiduciary duty:   The assignment of TIRZ receivables violated their fiduciary duty to Cage and Northrup, in their capacities as the Chapter 7 trustees for the estates of Gary Mendel and Robert Marek, respectively.**

In Texas, it is axiomatic that a partner owes a fiduciary duty to the other partners. *Bohatch v. Butler & Binion*, 905 S.W.2d 597, 602 (Tex. App.—Houston [14th Dist.] 1995, writ denied) (citations omitted); TEX. BUS. ORGS. CODE § 152.205 (Vernon 2006).  A fiduciary duty

requires an agent to exercise "the most perfect loyalty and the utmost good faith, the strictest integrity, and the fairest dealing on the part of the agent to his principal." *Nat'l Sur. Co. v. McCutcheon*, 270 S.W. 1062, 1064 (Tex. Civ. App.—Fort Worth 1925, writ dism'd w.o.j.) (citations omitted). In limited partnerships, Texas courts have analogized the fiduciary duty owed by a general partner to a limited partner to the relationship between trustee and beneficiary. *Crenshaw v. Swenson*, 611 S.W.2d 886, 890 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.) (citations omitted). In the words of Justice Cardozo, this "rule of undivided loyalty is relentless and supreme." *Smith v. Bolin*, 153 Tex. 486, 491, 271 S.W.2d 93, 96 (1954) (quoting *Meinhard v. Salmon*, 164 N.E. 545, 548 (N.Y. 1928)).

Classic's assignment of TIRZ receivables could not have occurred without Seiffert and Melanie violating their fiduciary duties to Cage and Northrup, the trustees for Mendel and Marek's Chapter 7 estates. This conclusion is based on three findings:  (1) Classic's corporate general partner, Classic Holdings, is a sham corporation, and therefore, Seiffert and Melanie (Classic Holdings' officers) are liable as general partners of Classic; (2) the directions by these general partners—whether given by Seiffert or Melanie—for Classic to assign the TIRZ receivables to the Defendants constituted a breach of the fiduciary duties owed by Seiffert and Melanie to Cage and Northrup; and (3) Seiffert and Melanie's arguments that they had no fiduciary duties to Cage and Northrup are without merit.

### 1.   Classic Holdings is a sham corporation, and therefore Seiffert and Melanie should be treated as general partners of Classic.

In Texas, a court may disregard a corporate entity when: "(1) it is made to appear that there is such a unity that the separateness of the corporation has ceased to exist; and (2) the facts are such that an adherence to the fiction of the separate existence of the particular corporation would, under the particular circumstances, promote injustice." *Robbins v. Robbins*, 727 S.W.2d

61

743, 746 (Tex. App.—Eastland 1987, writ ref'd n.r.e.) (citations omitted); *see Nibbi v. Kilroy* (*In re Kilroy*), 357 B.R. 411, 428 (Bankr. S.D. Tex. 2006) (piercing the corporate veil is available "when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." (quoting *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065, 1069 (3d Cir. 1979))).

The Court finds that Classic Holdings meets the criteria of a sham corporation. First, there is no separateness between the corporate entity and Melanie and Seiffert. [FOF 21–23]. Both parties had "plenary authority" to "do all things and take all actions that . . . they may deem necessary." [FOF 22]. Such a grant of power is not, standing alone, sufficient to display the unity of corporation and individual. However, viewed in light of the use of this authority, this grant displays that there is no separateness between the corporation and the individuals. Specifically, the plenary power bestowed up Melanie and Seiffert was used to exercise the corporation's power to fleece unknowing limited partners of Classic, while attempting to protect Melanie and Seiffert from personal liability. Such a use of authority shows that Classic Holdings is nothing more than an extension of Melanie and Seiffert's wills. *See, e.g., In re Great S. Life Ins. Co. Sales Practices Litig.*, 3:98-CV-1249X, 1999 WL 721968, at *6 (N.D. Tex. Sept. 15, 1999) (operation as a mere business conduit satisfies the lack of separateness element).

Second, Seiffert has attempted to hide his misdeeds behind the corporate veil of Classic Holdings. Seiffert formed Classic Holdings to replace Classic GP without notifying all the owners of limited partnership interests in Classic, which included the two Chapter 7 trustees of the estates of Mendel and Marek. [FOF 20]. Then, Seiffert saw to it that his daughter, Melanie, became the 100% owner of Classic Holdings, while he nevertheless remained in complete control of this entity. [FOF 23]. Between February 21, 2006 and June 28, 2006, Seiffert, as

manager of Classic Holdings and as president of Classic, transferred all of the unencumbered assets (i.e. the TIRZ receivables) out of Classic to selected limited partners without first noticing or compensating the excluded limited partners, i.e. Cage and Northrup (who held limited partnership interests of Mendel and Marek by virtue of Mendel and Marek filing Chapter 7 petitions). [FOF 20, 24–31]. Seiffert made assignments to his daughters, himself, PLD (which was owned by Seiffert and his daughters), and other insiders. [FOF 25–33]. Because Seiffert took all of these actions in his capacity as manager of the corporate general partner, Classic Holdings, [FOF 24], allowing him to escape liability by hiding behind the corporate veil of Classic Holdings would unjustly benefit Seiffert, his daughters, and PLD at the expense of the excluded Chapter 7 trustees and non-insider creditors of Classic. This will not do.

The Court concludes that the existence of Classic Holdings does not shield Melanie or Seiffert from personal liability for the malfeasance of Classic Holdings. As such, they will be treated as general partners of Classic for the remainder of this section.

**2.    The Chapter 7 Trustees of Mendel and Marek's bankruptcy estates held limited partnership interests in Classic, and therefore were owed a fiduciary duty by Seiffert and Melanie, in their capacities as general partners of Classic.**

Mendel and Marek held limited partnership interests in Classic. [FOF 7]. Subsequently, Mendel and Marek filed for bankruptcy on October 13, 2005 and October 14, 2005, respectively. [FOF 16–17]. After filing, all of Mendel and Marek's assets became property of their respective bankruptcy estates, and the respective Chapter 7 bankruptcy trustees (i.e. Cage and Northrup) took title thereto. *Phillips v. First City, Tex.-Tyler, N.A (In re Phillips)*, 966 F.2d 926, 929 n.4 (5th Cir. 1992) (stating "trustee assumes all of the debtor's partnership interests") (interpreting 11

U.S.C. § 323). Thus, as holders of limited partnership interests in Classic, Cage and Northrup were owed a fiduciary duty by Seiffert and Melanie.[41]

### 3. Seiffert and Melanie breached their fiduciary duty to Cage and Northrup when they assigned away Classic's only valuable unencumbered asset without notice or a proportional distribution to these two trustees.

As general partners of Classic, Seiffert and Melanie owed a fiduciary duty to the limited partners of Classic. *See* "Conclusions of Law (E)" *supra.* Failing to notify limited partners prior to a sale or transfer of partnership assets constitutes breach of fiduciary duty. *Hughes v. St. David's Support Corp.*, 944 S.W.2d 423, 425–26 (Tex. App.—Austin 1997, writ denied) (although limited partner's interest was small (0.5%) "they were at least entitled to notice before . . . partnership assets were [transferred]"). In Texas, "[a] fiduciary relationship exists where a party is under a duty to act or give advice for the benefit of another or where a special confidence is reposed in one who in equity and good conscience should be bound to act in the best interests of the one reposing confidence." *Brazosport Bank v. Oak Park Townhouses*, 889 S.W.2d 676, 683 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (citing *Tex. Bank & Trust v. Moore*, 595 S.W.2d 502, 507 (Tex. 1980)). One of these duties is the duty of "full disclosure of all matters affecting the partnership." *Hughes*, 944 S.W.2d at 426 (quoting *Hawthorne v. Guenther*, 917 S.W.2d 924, 934 (Tex. App.—Beaumont 1996, writ denied)). In the context of a limited partnership, "the general partner owes the same duty of full disclosure to the limited partners." *Hughes*, 944 S.W.2d at 426.

Three weeks after both creating Classic's new general partner, Classic Holdings, and becoming president of Classic, Seiffert began to use Classic Holdings to assign TIRZ receivables

---

[41] The Court would note that even if Classic Holdings was not a sham corporation, Seiffert and Melanie still would owe fiduciary duties to Cage and Northrup because Seiffert was president of Classic and Melanie was a vice president of Classic. As persons in control of Classic, they certainly owed a fiduciary duty to the limited partners of Classic. *Hughes v. St. David's Support Corp.*, 944 S.W.2d 423, 425–26 (Tex. App.—Austin 1997, writ denied).

to his daughters, PLD, Fitch, Mason, Gene, and himself. [FOF 19–32.] Cage and Northrup, the Chapter 7 trustees of Mendel and Marek's bankruptcy estates, were never notified of the assignments. [FOF 34]. This omission was a breach of fiduciary duty.

Further, Seiffert's transfers to his own kin are examples of bad faith. When considering whether a breach of fiduciary duty has occurred, a court may consider whether a transfer was fair and equitable to a limited partnership. *Dunnagan v. Watson*, 204 S.W.3d 30, 46 (Tex. App.— Fort Worth 2006, pet. denied). The court should also consider whether the "officer . . . acted in the utmost good faith and exercised the most scrupulous honesty toward the limited partnership." *Id.* In the present situation, Seiffert breached this duty by ensuring that Classic assigned the TIRZ receivables to his daughters and himself and by taking actions to accomplish this objective while keeping Cage and Northrup in the dark and making no distributions to them. Melanie assisted her father by agreeing to serve as 100% owner and president of Classic Holdings even though she did not understand the duties attendant to this position. [FOF 22]. Based upon these circumstances, the Court finds that Seiffert and Melanie breached their duties to Cage and Northrup.

### 4. Seiffert and Melanie's arguments that they had no fiduciary duties to Cage and Northrup are without merit.

The Defendants argue that Classic was solvent, and therefore Seiffert's assignment of the TIRZ receivables was reasonable and not a breach of a fiduciary duty. The Court disagrees. As previously noted, the Defendants introduced no expert testimony controverting the very credible testimony of Cole, the Trustee's expert witness on insolvency. Moreover, Seiffert gave no credible testimony that Classic was solvent. Therefore, based upon the record, the Court concludes that Classic was insolvent on February 21, 2006, the date of the first assignment, and at all times thereafter. [FOF 15, 36]. The transfer of assets (i.e. the assignments of the TIRZ

receivables from Classic) from an insolvent entity is unreasonable. *See* TEX. BUS. & COM. CODE ANN. § 24.005 (Vernon 2006). Thus, Seiffert and Melanie breached their fiduciary duties to Cage and Northrup, as well as all non-insider creditors of Classic. *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 534 n. 24 (5th Cir. 2004) (citing *Weaver v. Kellog*, 216 B.R. 563, 583-84 (S.D. Tex. 1997)).

Next, the Defendants assert that Cage and Northrup were not entitled to distributions from Classic and that, therefore, there could be no fraudulent transfers. The Defendants rely upon section 7.1 of the Agreement to support their argument. This provision sets forth that: "A Partner shall not Transfer all or any portion of a Limited Partnership Interest without the consent of the General Partner . . . [a]n attempted Transfer without the consent of the General Partner in violation of Section 7.1, shall be null and void and of no effect whatsoever." According to the Defendants, because Classic's general partner did not consent to the transfer of the limited partnership interests owned by Mendel and Marek to Cage and Northrup, respectively, when the former filed their Chapter 7 petitions, Cage and Northrup held no limited partnership interests in Classic. The Court disagrees. In *Smith*, the court rejected this argument by noting that "the debtor's contractual rights under the partnership agreement . . . are assets of the estate pursuant to § 541(a)(1). The restrictions on transfer or assignment contained in the partnership agreement do not prevent the vesting of the debtor's contractual rights in the bankruptcy estate because § 541(c)(1)(A) 'invalidates restrictions on the transfer of property of the debtor in order that all of the interests of the debtor will become property of the estate.'" *Samson v. Prokopf (In re Smith)*, 185 B.R. 285, 291–92 (Bankr. S.D. Ill. 1995). Thus, because § 541 of the Bankruptcy Code trumps any invalidating provision in the Agreement, Cage and Northrup took title to the limited partnership interests owned by Mendel and Marek, respectively, which means that Cage and

Northrup were just as entitled to distributions as their fellow limited partners, namely, Seiffert, his daughters, and PLD.

With respect to notice to Cage and Northrup, the Defendants argue that § 9.1 of the Agreement relieves them of having to give notice. This provision, in pertinent part, reads as follows: "[s]uch transferee shall have no right or authority . . . to participate in any decisions required or permitted to be made by a General Partner." The Defendants contend that this language means that when the general partner takes any action—for example, when Classic Holdings has Classic assign the TIRZ receivables—there is no requirement to give notice to any limited partner of such action.

Once again, the Court disagrees with the Defendants' interpretation of this language. This language suggests that holders of transferred limited partnership interests, such as Cage and Northrup, have no voice *in voting on the appointment of a new general partner*. However, this language does not relieve Seiffert and Melanie from fulfilling their fiduciary duties to all limited partners of giving them notice that a new general partner has been voted upon and established. It is one thing not to have a right to vote on a matter; it is quite another to be kept in the dark about the vote taken by those who did have the right to vote. *See Smith*, 185 B.R. at 290–91 ("A limited partner also has contractual rights arising from the partnership which include 'the right to have full information").

Moreover, there is a second notice that Seiffert and Melanie failed to give to Cage and Northrup. This is the notice that Classic was going to assign the TIRZ receivables to the various limited partners. There is no question that Seiffert and Melanie owed a fiduciary duty to Cage and Northrup to provide such notice. The Court makes this conclusion based upon the language cited in *Smith* above and on the language of sections 11.3 and 11.5 in the Agreement. Section

11.3 sets forth that if Classic's assets are to be distributed, then these assets are to be distributed "to the Partners in accordance with their Partnership Interests." Section 11.5 then sets forth that "each Partner shall look solely to the assets of the Partnership for the return of its capital contribution and shall have no right or power to demand or receive property other than cash from the Partnership, *and no Partner shall have priority over any other Partner as to the return of its capital contributions, distributions, or allocations*" (emphasis added).

There is no question that both Cage and Northrup are each a "Partner" as that term is defined in section 2.8 of the Agreement.  Hence, sections 11.3 and 11.5 apply to Cage and Northrup as holders of limited partnership interests in Classic.  The language in these two provisions makes it clear that the limited partnership interests held by Cage and Northrup deserved to be treated in the same manner as the limited partnership interests held by Seiffert, Melanie, Michelle, and Melinda—as well as by the other limited partners who are no longer defendants in this suit.  Yet, Cage and Northrup were frozen out from any distributions.  Seiffert orchestrated Classic's assignments of the TIRZ receivables to all holders of limited partnership interests in Classic *except* Cage and Northrup.  Cage and Northrup were clearly entitled to receive notice of these assignments because their rights as Partners were being violated under Article 11.5 insofar as their interests in Classic were being subordinated to the interests of their fellow partners.  In short, Cage and Northrup were left holding the bag; after the TIRZ receivables were assigned, Classic had no material assets which could be used to make distributions to Cage and Northrup so that they could receive the same return of capital that the other limited partners received.

Finally, Seiffert asserts that he assigned the TIRZ receivables without notice due to advice of counsel. This is not a valid defense. Although a debtor whose reliance is reasonable and in good faith may avoid liability for a fraudulent transfer claim, case law does not support the contention that one's reliance on counsel protects a general partner from claims of breach of fiduciary duty. *Bossart*, 2007 WL 4561300, at *18–19; *Dreyer*, 127 B.R. at 597 (stating "debtor's reliance on advice of counsel constitutes an excuse . . . only where his reliance is reasonable and in good faith"). Seiffert has committed fraud through his self-dealing, sharp practices, and violation of fiduciary duties. These shameless actions, particularly from a sophisticated businessman, make any alleged reliance on advice of counsel wholly unreasonable.

In sum, none of the arguments advanced by Seiffert and Melanie to refute the existence of their fiduciary duties towards Cage and Northrup have merit. Accordingly, this Court concludes that Seiffert and Melanie violated their fiduciary duties to Cage and Northrup by assigning the TIRZ receivables to Seiffert, his daughters, and PLD.

F.   **For purposes of determining actual intent, intent is imputed from Seiffert to his daughters.**

This Court may impute liability for Seiffert's fraud from Seiffert to his daughters. *See Deodati v. M.M. Winkler & Associates (In re M.M. Winkler & Associates)*, 239 F.3d 746, 749 (5th Cir. 2001) (citing *Strang v. Bradner*, 114 U.S. 555, 561 (1885)). It does not matter that Seiffert's daughters had minimal to no knowledge of their involvement with Classic, or that they participated in absolutely no negotiations regarding the receipt of TIRZ receivables in exchange for their partnership interests in Classic.

Each of these daughters knowingly and repeatedly permitted their father to both think and act for them. This Court will not allow an individual to simply stick her head in the sand and do whatever her business partner/father tells her to do—and then allow her to escape the consequences of her actions, particularly when she received a $300,000 benefit to the detriment of innocent creditors and parties-in-interest. With the knowledge that their father was a twice-convicted felon, Melanie, Michelle, and Melinda nevertheless took a "hear no evil, see no evil, speak no evil" approach whenever their father told them to execute documents. Whatever the daughters chose not to know, it is clear that they *did know* that their father was transferring a $300,000 asset to them in the form of a TIRZ receivable. This Court concludes that Seiffert's fraud may be imputed to his daughters because they willingly allowed their father to take actions on their behalf with reckless disregard of the consequences of his actions. Indeed, even if the daughters were totally unaware of their father's fraud, his bad acts may be imputed to them. *See M.M. Winkler*, 239 F.3d at 749 (citing *Strang*, 114 U.S. at 561).

## V.   Conclusion

A judgment consistent with this Memorandum Opinion will be entered on the docket once this Court determines the amount of attorney's fees and costs that should be awarded to the Trustee for his prosecution of this adversary proceeding. The Court will schedule a separate hearing on this issue, and then once this issue is decided, the Court will issue a judgment that awards the Trustee the following monetary relief: (1) the amount of $1,835,000.00, representing the net amount of TIRZ receivables (i.e. the sum of the TIRZ receivables still held by the Seifferts plus the Fitch deficiency, the Gene deficiency, and the Mason deficiency; (2) interest on the $1,835,000.00, which, as of July 10, 2008, totaled $100,283.18; (3) per diem interest that accrues as of July 10, 2008 and each day thereafter until the judgment is paid in full; and (4)

reasonable attorney's fees and costs incurred by the Trustee.  Finally, the judgment will set forth

that the Defendants must reassign the TIRZ receivables to the Trustee, and for each TIRZ

receivable that is reassigned, there will be a dollar-for-dollar credit against the amount of

$1,835,000.00.


Signed this 10th day of July, 2008.

Bankruptcy Judge Jeff Bohm

71

# EXHIBIT A

|   | Name of Claimant | Amount |
|---|---|---|
| 1. | Montgomery County | $ 1,780.21 |
| 2. | Harris County | $117,039.62 |
| 3. | First National Bank | $69,391.01 |
| 4. | Triple B Services, LLP | $ 67,545.27 |
| 5. | Robert G. Marek Bankruptcy Estate | $ 256,000.00 |
| 6. | Gary Mendel Bankruptcy Estate | $151,209.19 |
| 7. | Charles Fitch | $23,539.04 |
| 8. | Gulf Coast Bank & Trust Company | $735,388.00 |
| 9. | Houston Drywall Bankruptcy Estate | $1,300,000.00 |
| 10 | Western Surety Company | $311,584.37 |
| **Total** | | **$3,033,476.60** |

# EXHIBIT B*

| Recipient | Assignment | Settlement | Assignment Date | # Days | Interest** | Liability |
|---|---|---|---|---|---|---|
| Fitch | $50,000.00 | $25,000.00 | 6/28/2006 | 744 | $1,197.53 | $26,197.53 |
| Gene | $300,000.00 | $100,000.00 | 6/15/2006 | 757 | $9,747.67 | $209,747.67 |
| Matt | $475,000.00 | $0.00 | 2/28/2006 | 864 | $26,423.01 | $501,423.01 |
| Melanie | $300,000.00 | $0.00 | 2/22/2006 | 870 | $16,804.11 | $316,804.11 |
| Michelle | $300,000.00 | $0.00 | 2/21/2006 | 871 | $16,823.42 | $316,823.42 |
| Melinda | $300,000.00 | $0.00 | 2/22/2006 | 870 | $16,804.11 | $316,804.11 |
| PLD | $85,000.00 | $0.00 | 6/28/2006 | 744 | $4,071.62 | $89,071.62 |
| Mason | $400,000.00 | $250,000.00 | 2/21/2006 | 871 | $8,411.71 | $158,411.71 |
| Total | $2,210,000.00 | $375,000.00 | | | $100,283.18 | $1,935,283.18 |

\* Interest calculations are done through July 10, 2008

\*\* The interest rate is 2.35%